**Rudolph V. KLEIN, doing business as R. V. Klein Company, Petitioner,**

v.

**SECURITIES AND EXCHANGE COMMISSION and National Association of Securities Dealers, Inc., Respondents.**

**No. 298, Docket 23463.**

United States Court of Appeals Second Circuit.

Argued May 13, 1955.

Decided June 16, 1955.

Petitioner Rudolph V. Klein is a broker and dealer in securities, doing business as the R. V. Klein Company, of which he is sole owner. He was a member of the National Association of Securities Dealers, Inc. (hereinafter called NASD). In January of 1952, the District Business Conduct Committee, of the NASD district in which Klein conducted his business, filed charges against him and one other, alleging, inter alia, that sales of oil royalties to two customers between April and September of 1951 violated Sections 1 and 4 of Article III of the NASD Rules of Fair Practice.[1]

1. Rules of Fair Practice of National Association of Securities Dealers, Inc. Article III, Section 1:

"A member, in the conduct of his business, shall observe high standards of

The NASD is an association of securities dealers registered with the Securities and Exchange Commission under the provisions of Section 15A of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78o–3. Section 15A, enacted in 1938 and generally known as the Maloney Act, is an amendment to the Securities Exchange Act, intended to provide for the regulation of trade practices in over-the-counter transactions. It provides for the establishment and registration with the Commission of national associations of securities dealers which, in the first instance, would supervise the conduct and ethical standards of its members and exercise disciplinary power if necessary. If a dealer is disciplined or denied membership by the association, he may appeal to the Commission, or the Commission may review that action on its own motion. The NASD is the only association registered under Section 15A. For a more extensive treatment of its activities, see In the Matter of National Association of Securities Dealers, Inc., 17 S.E.C. 459.

The District Business Conduct Committee, which brought the charges against Klein, has original jurisdiction in enforcing the Association's Rules of Fair Practice. After it had filed a complaint, and after Klein had filed an answer, an authorized subcommittee of the Conduct Committee held hearings at which witnesses were heard and evidence introduced. The evidence showed a series of sales of oil royalties from Klein to Mrs. Stecher between April and September of 1951, and a series of sales of oil royalties from Klein to Mr. Kegel between June and August of that year. In all there were eighteen such sales to Mrs. Stecher and Mr. Kegel, amounting in the aggregate to approximately $164,000. In each sale the petitioner's mark-up percentage was 50%. The subcommittee found that the mark-ups violated Sections 1 and 4 of the NASD's Rules of Fair Practice, and recommended that Klein be censured and be assessed the cost of the proceeding. The full District Business Conduct Committee adopted the recommendations of its subcommittee and imposed the penalty of censure and assessed costs.

Although Klein did not apply to the Board of Governors of NASD for review of the District Committee's action, the Board of Governors, on its own motion took the matter under review, and increased the penalty from censure to expulsion from membership in the Association. The petitioner appealed that action to the SEC, pursuant to Section 15A (g) of the Maloney Act, and the Commission, after the submission of briefs and oral argument, dismissed the review proceeding and, in effect, affirmed the

commercial honor and just and equitable principles of trade."

The Board of Governors of the Association, on October 25, 1943, adopted the following interpretation of Section 1, Article III of the Rules of Fair Practice: "It shall be deemed conduct inconsistent with just and equitable principles of trade for a member to enter into any transaction with a customer in any security at any price not reasonably related to the current market price of the security." In the Matter of the Rules of the National Association of Securities Dealers, Inc., S.E.C. Act Release No. 3623, November 25, 1944.

Rules of Fair Practice of National Association of Securities Dealers, Inc. Article III, Section 4:

"In 'over-the-counter' transactions, whether in 'listed' or 'unlisted' securities, if a member buys for his own account from his customer, or sells for his own account to his customer, he shall buy or sell at a price which is fair, taking into consideration all relevant circumstances, including market conditions with respect to such security at the time of the transaction, the expense involved, and the fact that he is entitled to a profit; and if he acts as agent for his customer in any such transaction, he shall not charge his customer more than a fair commission or service charge, taking into consideration all relevant circumstances including market conditions with respect to such security at the time of the transactions, the expense of executing the order and the value of any service he may have rendered by reason of his experience in and knowledge of such security and the market therefor."

Board's decision to expel Klein from the Association.

M. Mac Schwebel, New York City, for petitioner.

William H. Timbers, Thomas G. Meeker, Arden L. Andresen and Elizabeth B. A. Rogers, for Securities and Exchange Commission, Washington, D. C.

John W. Lindsey, Washington, D. C., for National Association of Securities Dealers, Inc.

Before L. HAND, SWAN and FRANK, Circuit Judges.

FRANK, Circuit Judge.

1. Klein, in making the sales in question, acted as a seller to, and not as a broker or agent of, the two customers. Of this fact they were well aware, having been so notified by Klein. Nor were they inexperienced in buying and selling securities. Neither appeared as witnesses at the subcommittee hearing. Neither customer complained of the transactions with Klein. Before the proceedings began, but when they seemed imminent, the customers wrote letters to Klein expressing entire satisfaction as to their dealings with him. After the proceedings began, replying to an inquiry from the Secretary of the District Committee, Kegel wrote again, stating his satisfaction. The complaint of the District Conduct Committee contained a charge that, in recommending the purchases, Klein had "no reasonable grounds for believing that" his "recommendations were suitable for such customers in view of their security holdings and their financial situations and needs." After the hearing, this charge was dismissed for lack of evidence. The Chairman of the subcommittee said at the hearing that "there was no impropriety in obtaining the sales" of the customers' other securities, the proceeds of which they used in buying the oil royalties. This was correct, since the evidence discloses that Klein had not persuaded the customers to sell other securities in order to be able to purchase the oil royalties. The District Business Conduct Committee explicitly stated that the sole basis of the disciplinary measure was the mark-up of 50%.

2. The NASD Board of Governors and the SEC relied on instructions of NASD, published in 1943, based upon a survey of practices of dealers which disclosed that 47% of the sales studied were effected at a gross spread or mark-up of not over 3% and 71% at not over 5%. The result of this survey led the Association to adopt its so-called "5% policy": The Board of Governors then instructed the District Business Conduct Committees that, although no hard and fast rule or permissible spreads had been adopted, the 5% figure was intended as a guide or yardstick against which to judge the factors in any particular case.[2]

However, the survey leading to the "5% policy" did not include instances of sales of oil royalties. It had been suggested that NASD conduct a survey of its few members who sell oil royalties, but no such survey has been conducted. Nor has the Association circulated among its members any rule or interpretation as to permissible mark-ups of oil royalties. Concededly, they differ from stocks and bonds, since the former do not have established market prices. But the Commission has held[3] that the cost to the dealer of an oil royalty is the equivalent of a market price, especially where the dealer's purchase is substantially contemporaneous with his sale to a customer. We accept that ruling. The SEC has not laid down any fixed rule as to what is a proper spread in the sale of oil royalties. The SEC and NASD take the position, which we accept as correct, that conduct violative of the Association's Rules must be determined by case-to-case decisions.

Accordingly, if, without more, Klein had sold at a 50% mark-up, offering no

---

2. National Association of Securities Dealers, Inc., 17 S.E.C. 459 (1949); Loss, Securities Regulation (1951) 858–860.

3. Lawrence R. Leeby, 13 S.E.C. 499, 507 (1943).

proof at the hearing of large expenditures by him of time or money in investigating the oil royalties before he purchased them,[4] it may well be that we would bow to the so-called "expertise" of the SEC in concluding that, in the circumstances, the taking of such a profit violated Sections 1[4a] and 4 of Article III of the Association's Rules of Fair Practice.[5]

3. But the following facts persuade us that here that conclusion was clearly in error:

In 1950, the very District Business Conduct Committee which decided against Klein in the instant proceedings, had examined Klein's account with customers in which (to quote the decision of the Board of Governors) "there were two transactions in oil royalties with the exact percentage mark-up involved in the transactions before us." The Board, in its opinion, added that Klein, "with some justice, we feel, contends that he, therefore, had no reason to be concerned as to these spreads." Well it might. For Reeber, Secretary of the District Business Conduct Committee, testified that he and another official of the Committee had reviewed reports of the examiner who made the examination of Klein's books in 1950, and that the purpose of such a review is to see whether a member is conducting his business in accordance with the Association's Rules. He also testified that "after that processing is over, if no complaint of any kind has been made against the person whose records have been examined, and no cause of action or warning has been given of any kind, it is a fair assumption that nothing has been found warranting disciplinary action."

Yet the Board and the SEC held Klein guilty. This was error. Surely the failure of the Committee to discipline him in 1950 justified Klein in believing that a 50% mark-up did not violate the Rules. We do not regard those facts as constituting an estoppel. We do hold that they constituted an interpretation of the Rules on which Klein reasonably relied. If a dealer must act in a just and equitable manner in dealing with customers, the NASD and the Commission must also act justly and in an equitable manner in dealing with him. There were no circumstances with respect to his conduct in 1950—circumstances of which the committee was fully on notice—that distinguished it from that for which he was expelled.

4. The Commission argues that the 1950 incident should be disregarded because it involved only two sales with total mark-ups of $1,600 whereas the sales in the case at bar involved eighteen sales with total mark-ups of $54,755. We think the distinction of no significance.

5. The following additional facts—although absent the 1950 incident they might not be controlling—deserve consideration:

(a) Before the Commission in this case, counsel for NASD said that he thought a mark-up on oil royalties would be "some place between 5% and 50%," depending on the facts of the case, and

4. But, as to burden of proof, cf. National Association of Securities Dealers, Inc., 17 S.E.C. (1944) 459, 468–469.

4a It has been suggested that Section 1 is too vague to serve as a basis of disciplinary action so severe as that here imposed. However, in 1943 the Board of Governors interpreted Section 1 as follows: "It shall be deemed conduct inconsistent with just and equitable procedures of trade for a member to enter into any transaction with a customer in any security at any price not reasonably related to the current market price of the security." The NASD members were notified of this interpretation. Whether Section 1 is too vague and whether, if so, the interpretation validly cured the defect—cf. 17 S.E.C. 459—we need not here determine, because we are reversing on other grounds.

5. See R. H. Johnson & Co. v. S.E.C., 2 Cir., 198 F.2d 690, 695, to the effect that we review the action of the SEC, not that of NASD, and that we consider errors in the proceedings of NASD "only if and to the extent that they infected the Commission's action by leading to errors on its part."

(as we read his statement) that the 50% figure in the instant case "is the lowest figure that has ever been picked on."

(b) An organization known as the Eastern Oil Royalty Dealers Association, of which Klein has been a member since 1942, adopted a resolution in 1942, stating a policy approving oil-royalty mark-ups at not more than 50%. In October 1942, McCandless, then Acting Chief of the SEC Oil and Gas Unit of the Division of Corporate Finance, wrote the president of the Eastern Oil Royalty Dealers Association, referring to its resolution, in which McCandless said: "Although I am not in a position to speak for the Commission, this action on the part of your Association appears to be a definite step in the right direction." To be sure, this letter expressed the views of a subordinate official of the Commission; but it does reveal the opinion of a presumably well-informed man.[6]

(c) Two dealers in oil royalties, called by Klein as witnesses at the subcommittee's hearing, testified that a 50% mark-up in the sales of those securities is customary. The Commission argues that they did not testify "that such a mark-up is customary in sales of royalties where large amounts of money are involved, the sales occurred over a short-time period, and the seller's acquisition was substantially contemporaneous with the sale." But the subcommittee did not choose to ask the witnesses about such matters. Moreover, one of those witnesses specifically testified that the mark-ups in the particular sales in question were fair.[7]

6. The Commission argued before us that three of its own decisions, revoking broker-dealer registrations under Section 15(b) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78o(b), made and published before the sales in question, put Klein on notice that usually a 50% mark-up was wrongful. We cannot agree:

(a) In the Matter of Lawrence R. Leeby, 13 S.E.C. 499 (1943), the Commission found that Leeby had sold oil royalties to two women customers at mark-ups ranging up to 99.3% in the case of one customer, and up to 150% in the case of the other; that he had led or allowed these women to believe that he was buying the royalties for them as their agent; that he had never explained to them that he was not their agent; that they did not know the difference between a broker and a dealer; and that, in any event, he knew of their inexperience in securities matters and of their trust and confidence in him, so that he was engaged in the "exploitation of uninformed and unwary investors." [7a] Not only did many of Leeby's mark-ups far exceed 50% but, as we previously noted, Klein's customers were experienced investors and knew that Klein was acting as a seller, and not as a broker or agent; neither made any complaint; and, after the NASD proceedings began, these two customers wrote letters stating they were fully satisfied with their purchases.

(b) In the Matter of Patrick A. Trapp, 15 S.E.C. 349 (1944), the respondent had made false and misleading statements to customers in violation of the statute.

(c) In the Matter of Bernard J. Johnson, 20 S.E.C. 429 (1945), the respondent had used false representations in selling oil royalties at mark-ups ranging up to 118.18%.

---

6. After the NASD Committee had begun its proceedings against Klein, another SEC subordinate official wrote to NASD that McCandless' letter "does not represent any policy of the Commission, past or present."

7. There is also the following testimony by Klein: His books, records and papers had been periodically examined by representatives of the Commission, once in 1943, again in 1945–1946, and again in 1950. On each such occasion the books accurately reflected the true mark-ups on oil royalties, uniformly 50%, and at no time did the Commission indicate that there was any impropriety in that practice, or did it warn petitioner to discontinue it.

7a. See Loss, Securities Regulation (1951) 862 ff.

7. The Commission stresses the fact that Klein made no disclosure to the customers of the amount of the mark-ups in question. However, when an SEC Commissioner asked, in the Commission proceedings, whether the NASD had rested its decision on that fact, counsel for NASD replied: "I don't think the board of governors went into the question or the lack of disclosure. I don't think they considered, for example, that had there been disclosure here there would have been a different case. I think also they did not consider that the failure to disclose might have meant, under other circumstances, fraud. We are not so contending."

We are not to be understood as saying that NASD may not properly hold that, absent circumstances substantially like those which here existed, a 50% mark-up may be a prima facie basis for disciplinary action.

Reversed and remanded for further proceedings not inconsistent with this opinion.