Sharon M. GRAHAM and Stephen C. Voss, Petitioners,

v.

SECURITIES AND EXCHANGE COMMISSION, Respondent.

No. 99–1029.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 8, 1999.

Decided Aug. 18, 2000.

Ida Wurczinger Draim argued the cause and filed the briefs for petitioners.

Susan S. McDonald, Senior Litigation Counsel, Securities and Exchange Commission, argued the cause for respondent. With her on the brief were David M. Becker, Deputy General Counsel, Jacob H. Stillman, Solicitor, and Robert C. Stacy, II, Attorney.

Before: GINSBURG, TATEL, and GARLAND, Circuit Judges.

Opinion for the Court filed by Circuit Judge GARLAND.

GARLAND, Circuit Judge:

Sharon Graham and Stephen Voss petition for review of an order of the Securities and Exchange Commission (SEC) sanctioning them for conduct relating to trades executed for their customer, John Broumas. The Commission found that Graham, a registered representative with Voss' brokerage firm, violated section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder by aiding and abetting Broumas in the fraudulent trading of stock. The Commission further concluded that Voss had failed reasonably to supervise Graham with a view to preventing the securities violations. Graham challenges the Commission's findings on several grounds; Voss' challenge depends solely upon the exoneration of Graham. Because we conclude that the Commission's decision was reasonable and supported by substantial evidence, we deny the petition for review and affirm the SEC's order.

## I

Voss is the owner and president of an independent discount brokerage firm, Voss & Co., Inc. (VCI), located in Springfield, Virginia. Graham began working in the securities industry in 1982 and joined VCI in September of 1984. She was a registered representative,[1] as well as VCI's cashier and back office assistant. She was also VCI's primary "house" broker, handling house accounts on a noncommission basis as well as some 250 of her own accounts for commissions. *See* J.A. at 371–72.[2] Graham spent the bulk of her time performing cashiering and back office duties. In February of 1990, she received her principal's license.[3] Graham's immediate supervisor, James Pasztor, was VCI's vice-president, general manager, and SEC compliance officer.

One of the firm's house accounts was a joint account in the names of John Broumas and his wife, Ruth. Broumas' troubles began when the stock market crashed in 1987. To cover his losses, he borrowed heavily and by May 1989 owed roughly $2 million in personal loans and $1 million in mortgages. *See id.* at 180–85. Unable to borrow any more from banks, Broumas

launched upon a scheme that the SEC described as "similar to check-kiting." *Sharon M. Graham,* Release No. 34–40727, 68 S.E.C. Docket 1934, 1998 WL 823072, at *2 (Nov. 30, 1998).[4]

Broumas held a substantial number of shares in the Class A common stock of James Madison, Ltd. (JML), a holding company for a family of banks with which he was affiliated. Although JML stock was listed on the American Stock Exchange (AMEX), Broumas undertook a series of trades in the over-the-counter market. Broumas arranged wash trades and matched orders[5] of JML stock among accounts in his own name and in the name of nominees whose accounts he controlled. Broumas directed these trades among at least 25 different brokerage accounts he controlled at 14 different broker-dealers. In each case, he would instruct one broker to buy and another to sell a specified number of shares at a specified price, thus moving the stock from one of his (or his controlled) accounts to another. *See* J.A. at 211. Neither broker was told by Broumas that the other account also belonged to or was controlled by him.

Broumas' stock was held in margin accounts.[6] Under the rules · applicable to

---

1. A representative is a person associated with a National Association of Securities Dealers (NASD) member firm who is engaged in supervision, solicitation, or conduct of securities business. The NASD requires that representatives of member firms register with the Association and pass a qualifying exam. *See* 6 Louis Loss & Joel Seligman, Securities Regulation 2809–11 & n.42 (3d ed. 1990).

2. At VCI, house accounts were not assigned to any particular broker. Commissions on trades in these accounts were paid to the firm rather than to the brokers executing the trades.

3. A principal is a person who is "actively engaged in the management of the [NASD] member's ... securities business." *Markowski v. SEC,* 34 F.3d 99, 101 n. 1 (2d Cir.1994) (internal quotation omitted). An additional examination is required to become registered as a principal. *See* 6 Loss & Seligman, *supra,* at 2810–11 n. 42.

4. For a description of the mechanics of a check-kiting scheme, see *Williams v. United States,* 458 U.S. 279, 281 n. 1, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982).

5. "Wash trades," also called "wash sales," are "transactions involving no change in beneficial ownership." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 205 n. 25, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). "Matched orders" are "orders for the purchase/sale of a security that are entered with the knowledge that orders of substantially the same size, at substantially the same time and price, have been or will be entered by the same or different persons for the sale/purchase of such security." *Id.*; see *Michael Batterman,* 46 S.E.C. 304, 305 (1976).

6. In a margin account:

   the broker lends the customer money to allow him to purchase securities. The customer advances only a portion of the purchase price and pays interest on the bal-

those accounts, Broumas could obtain the proceeds from a sale one day after the transaction was completed, but could wait at least five business days until the settlement date to pay for the corresponding purchase. *See Graham,* 1998 WL 823072, at *2; *see also* 12 C.F.R. § 220.4 (1989). When the settlement date arrived, Broumas sometimes executed another set of wash trades or matched orders to obtain the funds he needed to make the payment—as if he were playing a fiscal version of "musical chairs."[7]

As Broumas' financial situation continued to deteriorate, "many of the broker-dealers with which he dealt ... bec[ame] increasingly reluctant to extend him credit." *Graham,* 1998 WL 823072, at *2. Broumas then began to effectuate wash and matched trades through accounts in the names of relatives and business associates. The trades in these nominee accounts were placed by Broumas or at his direction with funds he provided and for his benefit. Between January 1, 1989 and June 30, 1990, Broumas effectuated 203 sets of wash and match trades in JML stock, involving a total of 420 trades. Each trade typically involved the purchase and sale of between 3,000 and 12,000 JML shares. *See id.*

Seventy-six of the directed trades were conducted by VCI, and approximately 60 of those—an average of one every week-and-a-half—were executed by Graham. At the beginning of 1989, Broumas' joint account at VCI held 37,500 shares of JML stock. From January 23, 1989 through May 24, 1990, Broumas instructed VCI to exchange a total of 644,800 shares. Although Broumas' account was a "house" account, a rapport soon developed between Broumas and Graham and he began to ask for her specifically. Generally, Broumas would give Graham a specific number of shares to trade, a particular limit price, the name of the firm ("contra-broker") that would execute the other side of the trade, and the name of the broker he wanted her to contact at that firm. After consulting the AMEX listing to verify that the order price was within the listed bid and offer prices, Graham would complete the trade. Broumas usually asked VCI to issue a check for the proceeds the day after the sale. *See id.* at *3.

Graham observed that Broumas "had a peculiar way of trading." J.A. at 306. Of the 100 house accounts she handled during this time, only Broumas directed trades, and only Broumas traded in such large quantities. *See id.* at 285. Because Broumas always identified the specific contact persons to call at the contra-brokers, Graham came to believe that Broumas controlled the shares in the accounts or at least "had connections" with them, *id.* at 382, although Broumas never told her so and she "never asked him," *id.* at 286–87. Finally, from her work as the firm's cashier, Graham noticed that Broumas "never seemed to ... make any money on his trades." *Id.* at 380, 383. Eventually, Graham asked Broumas directly why he traded in such a strange manner, and Broumas answered that "he owed bank notes or bank loans and that for him to sell the stock was an easier way for him to get the money to pay those loans, as opposed to having to go to other means." *Id.* at 356–57; *see also id.* at 308.[8]

Due to Broumas' suspicious manner of trading, Graham undertook special precau-

---

ance. The broker maintains the securities purchased as collateral. If the value of the securities declines, the broker may seek more collateral for the protection of his "loan."
*Liang v. Dean Witter & Co.,* 540 F.2d 1107, 1109 n. 2 (D.C.Cir.1976).

7. Broumas testified that the proceeds available to him during the settlement period allowed him to "take care of my bank notes or

whatever was pressing me that day and then worry about how I was going to handle the purchase price and the amount of the purchase price a week later." J.A. at 209.

8. At trial, Broumas claimed that he sold the shares to himself, rather than to a buyer on the open market, because he "wanted to maintain [his] position [in JML] at that price." J.A. at 212.

tions to protect her firm's financial interests. She knew that Broumas had financial problems, that he had bounced checks, and that he often owed money on his joint account. *See id.* at 288, 317, 343. As a consequence, she feared that "Broumas' orders presented a financial risk to the firm." Graham Br. at 14 (citing J.A. at 317). Graham discussed Broumas' "peculiar way of trading" with her supervisor, James Pasztor, and, as a safeguard, generally sought his prior approval for Broumas' trades—something she rarely did with respect to her other house accounts. J.A. at 283–85, 316–17.

By early 1989, Broumas was having difficulty making timely payment for trades through his VCI joint account. Although he had five business days to pay for a purchase, both Graham and Voss knew that VCI's clearing firm,[9] U.S. Clearing Corp., had been required to obtain "quite a few" extensions of time. *Graham,* 1998 WL 823072, at *4 (quoting, without citation, J.A. at 296). In March of 1989, the margin supervisor for the clearing firm told Pasztor that Broumas had received too many extensions, and that he thought Broumas might be "check kiting" through his brokerage account. Pasztor agreed. *See id.* at *4 & n. 17. As a consequence, the clearing firm imposed restrictions on Broumas' account, and directed Pasztor to bar trading unless the account already contained cleared funds or stock. Pasztor informed Graham, Voss, and Broumas that the account was restricted. *See id.* at *4.

Thereafter, Broumas called Voss and asked to open a second account, entitled "Les Girls," purportedly for a partnership between Broumas' wife and daughter. Voss agreed to permit the opening of the new account, although he never spoke to Broumas' wife or daughter and testified that he "suspected" Broumas would be advising on the trading. J.A. at 564. Graham completed the form to open the "Les

Girls" account, although she had never spoken to Broumas' wife or daughter either. Graham conceded that she regarded the account as belonging to Broumas, and that she knew he placed all the trades. Although she believed Broumas had opened the Les Girls account to prevent the restricted joint account "from being closed out or his position sold out," *id.* at 295–96, Graham nonetheless continued to place directed trades for him. Broumas directed 40 JML stock trades through the Les Girls account; between March 21 and August 29, 1989, all of Broumas' VCI trades in JML stock were effected through that account.

In February of 1990, Broumas began directing trades in JML stock through yet another VCI account. These trades were made through an already existing house account maintained by his friend and attorney, Lawton Rogers. Broumas called Graham to direct trades through the Rogers account; Graham would then call Rogers to confirm them. Graham told Pasztor about the directed trades, who in turn told Voss. Voss said he "didn't have a problem" with the trades because Broumas and Rogers were "bosom buddies." *Id.* at 429.

At the beginning of April 1990, a check Broumas had given VCI to pay for the purchase of JML shares was returned for insufficient funds. Pasztor again restricted the joint account and told Graham that Broumas could not trade without cleared funds. Initially, Voss concurred. At the end of April, however, Broumas invited Voss to lunch. Following the lunch, Voss told Pasztor that Broumas could continue to trade. Pasztor in turn informed Graham. *See Graham,* 1998 WL 823072, at *5.

Eventually, Broumas became unable to satisfy his margin calls and failed to pay for his last trade through VCI. Although

---

**9.** A clearing broker performs "back office services such as clearing stock, handling customer funds, holding customer securities, dealing with transfer agents, and matching of trades with the exchanges and market makers" for firms that do not have the capacity to perform these functions. SEC Br. at 18 n.17; *see, e.g., United States v. Russo,* 74 F.3d 1383, 1386 (2d Cir.1996).

the firm liquidated Broumas' account, it suffered a loss of over $60,000. *See id.* Broumas filed for personal bankruptcy in early 1991. *See id.* at *2 n. 3.

On September 27, 1991, the SEC filed a complaint in district court alleging that, from January of 1989 through July of 1990, Broumas violated the securities laws by executing wash trades in JML stock. *See SEC v. John G. Broumas,* Civ.A. No. 91–2449 (D.D.C.). Without admitting or denying the allegations, Broumas consented to the entry of a permanent injunction against future violations. Subsequently, Broumas pled guilty to utilizing a check-kiting scheme to meet margin calls. *See United States v. Broumas,* 69 F.3d 1178, 1179–80 (D.C.Cir.1995).

On September 30, 1994, the SEC issued an administrative complaint against Graham, Voss, and Pasztor in connection with Broumas' trades from January 1989 through May 1990. Graham was charged with willfully aiding and abetting Broumas' violations of two sections of the Securities Exchange Act of 1934: section 9(a)(1), which prohibits the effectuation of wash trades or matched orders

> [f]or the purpose of creating a false or misleading appearance of active trading in any security registered on a national securities exchange, or a false or misleading appearance with respect to the market for any such security,

15 U.S.C. § 78i(a)(1), and section 10(b) (and Rule 10b–5 thereunder), which makes it unlawful

> [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange ... any manipulative or deceptive device or contrivance ...,

*id.* § 78j(b). Pasztor and Voss were charged with violating section 15(b)(4)(E) for failing reasonably to supervise Graham "with a view to preventing" the violations. *Id.* § 78*o*(b)(4)(E). The charges against Pasztor were severed from those against Voss and Graham. The SEC subsequently found Pasztor liable for failure to supervise and sanctioned him with a three-

month suspension. *See James J. Pasztor,* Release No.34–42008, 70 S.E.C. Docket 1979 (Oct. 14, 1999).

The charges against Graham and Voss were heard before an Administrative Law Judge (ALJ), who found Graham and Voss liable on all charges, suspended them from association with any broker or dealer for two and three months, respectively, and ordered Graham to cease and desist from future violations. *See Sharon M. Graham,* Release No. 34–82, 60 S.E.C. Docket 2707, 1995 WL 769011, at *28 (Dec. 28, 1995). On appeal, the SEC held that Broumas' trading did not violate section 9(a)(1) because the specific manipulative intent required under that section had not been established, and hence that Graham did not aid and abet such a violation. *See Graham,* 1998 WL 823072, at *6 n. 27. However, the Commission affirmed the ALJ's holding that Broumas' wash and matched trades violated section 10(b) and Rule 10b–5 because they operated as a fraud upon: a) the market for JML stock, by creating a deceptive appearance of market activity; and b) the brokerage firms through which Broumas traded, which were induced to pay him money they would not have paid had they known the sales were not bona fide. *See id.* at *5. The Commission further affirmed the ALJ's findings that Graham aided and abetted Broumas, and that Voss failed reasonably to supervise, and it upheld the two– and three-month suspensions. *See id.* at *7, *9, *10. Graham and Voss petition for review of the Commission's order.

**II**

The securities laws provide for judicial review of SEC disciplinary proceedings in the courts of appeals. *See* 15 U.S.C. § 78y(a)(1). The Commission's findings of fact, "if supported by substantial evidence, are conclusive." *Id.* § 78y(a)(4); *see Steadman v. SEC,* 450 U.S. 91, 96 n. 12, 101 S.Ct. 999, 67 L.Ed.2d 69 (1981). Its other conclusions may be set aside "only if 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law,' 5 U.S.C. § 706(2)(A)." *Wonsover v. SEC,* 205 F.3d 408, 412 (D.C.Cir.2000) (internal quotation omitted).

■■■ Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful to use deceptive devices in connection with the purchase or sale of securities. *See* 15 U.S.C. § 78j(b). Rule 10b–5, promulgated pursuant to section 10(b), specifically provides that it is unlawful for any person, in connection with the purchase or sale of any security:

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made ... not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

17 C.F.R. § 240.10b–5. Although variously formulated, three principal elements are required to establish liability for aiding and abetting a violation of section 10(b) and Rule 10b–5: (1) that a principal committed a primary violation; (2) that the aider and abettor provided substantial assistance to the primary violator; and (3) that the aider and abettor had the necessary "scienter"—i.e., that she rendered such assistance knowingly or recklessly. *See SEC v. Fehn,* 97 F.3d 1276, 1287–88 (9th Cir.1996); *Bloor v. Carro, Spanbock, Londin, Rodman & Fass,* 754 F.2d 57, 62 (2d Cir.1985); *SEC v. Falstaff Brewing Corp.,* 629 F.2d 62, 72 (D.C.Cir.1980); *Investors Research Corp. v. SEC,* 628 F.2d 168, 178 (D.C.Cir.1980); *see also SEC v. Steadman,* 967 F.2d 636, 641 (D.C.Cir. 1992).

Graham contests all three of these elements: She contends that Broumas' conduct did not constitute a violation of section 10(b) or Rule 10b–5, that she did not substantially assist such a violation, and that she did not do so knowingly or recklessly. Graham and Voss further argue that the SEC is estopped from sanctioning them because the SEC and National Association of Securities Dealers (NASD) observed Broumas' trading and failed to alert petitioners to it or identify it as a securities violation. Finally, Voss argues that because Graham is not guilty of aiding and abetting, he cannot be guilty of failing reasonably to supervise her. We consider these arguments below.

## A

■■■ The SEC based its conclusion that Broumas' trades constituted a fraud under section 10(b) and Rule 10b–5 on two independent theories. First, it concluded that the trades constituted a fraud on the market for JML stock by creating a deceptive appearance of market activity. Second, it concluded that Broumas defrauded the broker-dealers through which he traded by causing them to remit sales proceeds to him that they would not have paid had they known the true nature of the transactions. Although Graham challenges the validity of the first theory,[10] we need not resolve that dispute because Broumas' trades clearly constitute violations under the second.

As the SEC explained, Broumas, unable to obtain further loans from banks, arranged wash trades and matched orders "for the purpose of obtaining a float in a scheme similar to check-kiting." *Graham,* 1995 WL 769011, at *4.[11] Broumas'

---

10. Graham disputes that Broumas' trades constituted a fraud on the market. She argues, inter alia, that Broumas' trades were not material because they constituted a small percentage of the total volume of outstanding JML shares. The SEC counters that the trades nonetheless made up a substantial proportion of the daily volume of trades on the days they were reported.

11. Broumas acknowledged that he began wash trading because he "didn't have the credit" to meet his existing obligations, J.A. at 174, and couldn't borrow money from a bank because he had "reached [his] limit," *id.* at 213. He also testified that on many occasions he sold JML stock to himself in order to meet margin calls. *See id.* at 205.

scheme caused the selling brokers to pay him immediately the anticipated proceeds from the contrived sales, payments they would not have made had they realized that Broumas—with his shaky financial condition—was also on the other side of the transaction, promising to pay for the same stock within five days. *See Graham,* 1998 WL 823072, at *6.[12] Indeed, not only did Broumas fail to disclose that he was on both sides of the transaction, but he also took affirmative steps to hide that fact—by trading through the Les Girls and Rogers accounts—when the clearing firm restricted trading in his own account.[13]

■ As we have noted, although Broumas received payment for the sale immediately, he did not have to make payment for the "purchase" of the same shares until five days later. Were he unable to make that payment—an eventuality his uncertain financial condition rendered likely and which ultimately occurred—the selling broker (or the purchasing broker, if it had paid over the funds to the selling broker and received the stock) would be forced to cover the loss by selling the JML shares. But there was no guarantee that those shares would cover the amount advanced to Broumas by the broker—either because the stock was no longer worth the price Broumas himself had offered a week earlier,[14] or because it had never been worth that amount in the first place.[15] Indeed, something like this happened to VCI, which suffered a $60,000 loss when forced to liquidate Broumas' account after he failed to pay for his last transaction.[16]

■ Graham contends that Broumas' scheme cannot violate section 10(b) because fraud on a broker is not fraud "in connection with the purchase or sale of [a]

**12.** *See SEC v. Drysdale Sec. Corp.,* 785 F.2d 38, 42 (2d Cir.1986) (finding § 10(b) violation where, in order to honor its obligation to resell securities on settlement date of reverse "repo," defendant "had to purchase identical securities, something which its insolvency may have rendered impossible"); *see also A. T. Brod & Co. v. Perlow,* 375 F.2d 393, 397 (2d Cir.1967) (upholding claim for fraud against broker under § 10(b) where investors placed purchase order with fraudulent intent to pay for securities only if their market value increased by settlement date, and further noting that scheme effectively resulted in "an involuntary extension of credit without compliance with the margin requirements").

**13.** Broumas testified that he began asking Rogers to allow him to direct trades through his account "[b]ecause I didn't have the credit and my margin calls wouldn't permit me to trade with those other brokers of mine." J.A. at 174; *cf. United States v. Sayan,* 968 F.2d 55, 61 (D.C.Cir.1992) (affirming conviction for check–kiting and noting that "creating fictitious payees and forging endorsements" constituted a material part of the fraud, because "[i]f [the defendant] had merely made the drafts payable to herself, the bank would not have granted her immediate credit").

**14.** The price of JML Class A stock began to decline in February of 1990. *See Graham,* 1995 WL 769011, at *2. On February 2, 1990, it closed at $6 per share. On May 24, 1990, it closed at $4 5/8. *See* J.A. at 754–55. Broumas testified that around this time the "stock dropped dramatically and I had to sell a lot of things. I was finding it difficult to meet those interest payments and those loan payments." *Id.* at 188.

**15.** We note that unlike a plaintiff in a private damages action, the SEC need not prove actual harm. *See Schellenbach v. SEC,* 989 F.2d 907, 913 (7th Cir.1993); *SEC v. Blavin,* 760 F.2d 706, 711 (6th Cir.1985).

**16.** In her reply brief, Graham contends that Broumas did not defraud the brokers into paying him the proceeds of the JML sales because he was "entitled" to the money. Graham Reply Br. at 8. Graham claims that the funds Broumas received from the "sell side" of the transaction were the sale proceeds of his own stock, and therefore his own money. The selling broker, however, did not pay Broumas out of the actual proceeds of the sale, but rather out of "proceeds" it anticipated would be paid five days later. Unbeknownst to the broker, that payment would have to come from Broumas himself, and, if Broumas were unable to pay, the selling broker's recourse was against the JML stock—which may well have been insufficient to cover what the broker had paid out. Of course, if the transaction is viewed from the "buy side," there is even less justification for regarding the money as Broumas' own, as the purchasing broker extended Broumas credit on margin to purchase the stock from the contra-broker.

security," as required by the statutory language. 15 U.S.C. § 78j(b). To constitute a violation of section 10(b), Graham maintains, "the fraud must have been perpetrated upon an actual or potential investor." Graham Br. at 27. As the brokers were never parties to the securities transactions, but merely executed them, Graham contends that no violation of section 10(b) was possible.

Graham's argument is foreclosed by the Supreme Court's unanimous decision in *United States v. Naftalin*, 441 U.S. 768, 99 S.Ct. 2077, 60 L.Ed.2d 624 (1979). There, the Court confronted the same challenge to a criminal conviction under section 17(a)(1) of the Securities Act of 1933, which makes it unlawful for any person "in the offer or sale of any securities" to employ any device, scheme, or artifice to defraud. 15 U.S.C. § 77q(a)(1). The defendant had placed sell orders for stock he did not own, gambling that he could make offsetting purchases at lower prices before he was required to deliver the stock. Defendant did not dispute that he defrauded the brokers who executed the orders, but contended, as petitioners do here, that the statute "applies solely to frauds directed against investors, and not to those against brokers." *Naftalin*, 441 U.S. at 772, 99 S.Ct. 2077.

The Court rejected the argument. It held that the statutory phrase, "in the offer or sale of any securities," was intended to be "define[d] broadly," and is "expansive enough to encompass the entire selling process, including the seller/agent transaction." *Id.* at 773, 99 S.Ct. 2077. The "language does not require," the Court said, "that the fraud occur in any particular phase of the selling transaction," or "that injury occur to a purchaser."[17] *Id.*

Turning to the statutory purpose, *Naftalin* emphasized that "neither this Court nor Congress has ever suggested that investor protection was the *sole* purpose of the Securities Act." *Id.* at 775, 99 S.Ct. 2077. Although "[p]revention of frauds against investors was surely a key part ... so was the effort to achieve a high standard of business ethics ... *in every facet of the securities industry*." *Id.* (internal quotation omitted) (second alteration in original); *see United States v. O'Hagan*, 521 U.S. 642, 658–59, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997) (reaching same conclusion regarding § 10(b) of the Securities Exchange Act). Moreover, the Court continued, "the welfare of investors and financial intermediaries are inextricably linked—frauds perpetrated upon either business or investors can redound to the detriment of the other and to the economy as a whole." *Naftalin*, 441 U.S. at 776, 99 S.Ct. 2077.

Although *Naftalin* involved section 17(a)(1) of the Securities Act, rather than section 10(b) of the Securities Exchange Act, the relevant language is virtually identical. *Compare* 15 U.S.C. § 77q(a)(1) ("in the offer or sale of any securities"), *with id.* § 78j(b) ("in connection with the purchase or sale of any security"). Indeed, the Court recognized an argument that section 17(a)(1) might be *narrower* than section 10(b), but held that "even if 'in' were meant to connote a narrower group of transactions than 'in connection with,'" it would still cover fraud against brokers. *Naftalin*, 441 U.S. at 773 n. 4, 99 S.Ct. 2077. *Naftalin's* application to the broader wording of section 10(b) is, therefore, a fortiori. This point is further confirmed by the Supreme Court's subsequent description of *Naftalin* as having "appl[ied] § 17(a) of the 1933 Act to con-

---

17. The Court noted that the case would be different if it had been brought by private plaintiffs, because the class of plaintiffs who may bring private actions under Rule 10b–5 is limited to purchasers or sellers. *See Naftalin*, 441 U.S. at 774 n. 6, 99 S.Ct. 2077; *see also United States v. O'Hagan*, 521 U.S. 642, 664–65, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997); *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 751 n. 14, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975); *SEC v. National Sec., Inc.*, 393 U.S. 453, 467 n. 9, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969).

duct also prohibited by § 10(b) of the 1934 Act," *Herman & MacLean v. Huddleston,* 459 U.S. 375, 383, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983), and by its recent affirmation that section 10(b) "does not confine its coverage to deception of a purchaser or seller of securities," *O'Hagan,* 521 U.S. at 651, 117 S.Ct. 2199. *See also SEC v. Jakubowski,* 150 F.3d 675, 680 (7th Cir.1998) (noting that *Naftalin* was "a case under § 17 of the 1933 Act, which requires proof that the fraud occurred 'in' an offer or sales of securities—a tighter link, one might suppose, than 'in connection with'") (citation omitted); *A. T. Brod & Co. v. Perlow,* 375 F.2d 393, 396–97 (2d Cir.1967) (holding that § 10(b) and Rule 10b–5 apply to frauds against brokers).

Graham also contends that there cannot have been an actionable fraud in this case because the SEC charged owners and brokers at the contra-firms with securities violations like those of petitioners. "Clearly," Graham declares, "Broumas' alleged aiders and abettors cannot also be his defrauded victims." Graham Br. at 26. This argument, too, is of no avail.

First, even assuming that such a defense were valid, the SEC did not charge all of the contra-brokers with securities violations.[18] Second, this purported defense has no application to the clearing firms— none of which played any role in Broumas' scheme and one of which expressly tried to restrict it. Broumas, assisted by Graham and Voss, established and traded through the Les Girls and Rogers accounts specifically to avoid those restrictions, thus de-

ceiving the clearing firm into making the advances necessary to execute his transactions. *See Graham,* 1998 WL 823072, at *3–*4; *Richard D. Chema,* Release No. 34–40719, 68 S.E.C. Docket 1911, 1998 WL 820658, at *3 (Nov. 30, 1998) (concluding that Broumas also defrauded another broker-dealer's clearing firm into advancing funds); *see also United States v. Russo,* 74 F.3d 1383, 1388, 1390 (2d Cir.1996) (upholding conviction under § 10(b) where scheme involved generating false cash credits from clearing broker).[19]

Finally, whatever the involvement of the brokers or owners, fraud on their corporate institutions is an independent matter.[20] As the Supreme Court recognized in *Naftalin,* fraud on brokerage firms affects more than the health of those firms alone. *See Naftalin,* 441 U.S. at 776, 99 S.Ct. 2077. When the music stops, the firm left without a chair (payment or collateral) does not simply leave the game. "Losses suffered by brokers," whether or not covered by insurance, "increase their cost of doing business, and in the long run investors pay at least part of this cost through higher brokerage fees." *Id.* Equally important, fraud against brokers may "create a level of market uncertainty that could only work to the detriment of both investors and the market as a whole." *Id.* Accordingly, we have no warrant for overturning the SEC's determination that Broumas violated section 10(b) and Rule 10b–5.

**18.** Broumas' wash trades involved a total of 14 different broker–dealers. The VCI trades involved eight different firms, while the SEC instituted administrative proceedings against four. *See Graham,* 1998 WL 823072, at *3 n. 14.

**19.** Like the other brokers, the clearing firm was exposed to the risk that funds it advanced might not have been repaid at the time Broumas became insolvent. Although the clearing broker might be able to recover against the introducing firm in the event of nonpayment, it would incur transaction costs in so doing— and there was always the risk that Broumas' scheme would bankrupt one of the broker-

dealers involved. *See Richard D. Chema,* 1998 WL 820658, at *4–*5.

**20.** *Cf. Superintendent of Ins. v. Bankers Life & Cas. Co.,* 404 U.S. 6, 12, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971) (holding that § 10(b) applies to fraud on corporation by controlling stockholder, and that "the fact that creditors of the defrauded" corporation "may be the ultimate victims does not warrant disregard of the corporate entity") (footnote omitted); *United States v. Saks,* 964 F.2d 1514, 1518–19 (5th Cir.1992) (affirming finding of intent to defraud banking institution, notwithstanding bank officers' collusion with customer).

## B

■ Having concluded that Broumas' stock-kiting scheme constituted a primary violation of the securities laws, the next question is whether Graham substantially assisted Broumas in that violation. We have no doubt that she did. Graham placed 60 directed trades for Broumas, an average of one every week-and-a-half during the 18–month period at issue. She opened the Les Girls account and executed wash trades from both that account and from the account of Lawton Rogers. Such conduct is more than sufficient to constitute substantial assistance. *See SEC v. U.S. Envtl., Inc.,* 155 F.3d 107, 112 (2d Cir.1998) (holding trader who recklessly executed manipulative buy and sell orders for customer liable as primary violator).

Graham contends that this conclusion is inconsistent with our decision in *Zoelsch v. Arthur Andersen & Co.,* 824 F.2d 27 (D.C.Cir.1987). She describes *Zoelsch* as a case in which we dismissed an aiding and abetting claim against an accounting firm, "which had issued an audit report with respect to corporate financial statements" but had "played no role in the use of certain figures from those statements in a prospectus and no role in the publication of any misleading financial statements." Graham Br. at 31. In fact, the accounting firm's relationship to the misleading financial statements was even further removed than Graham describes,[21] but the distance reflected in her description suffices to distinguish that case from this one: unlike the accounting firm in *Zoelsch,* Graham did play a role—and a substantial one—in Broumas' deceptive trades.

■ Graham further contends that she may not be regarded as substantially assisting Broumas since the execution of his trades was merely a "ministerial" act on her part. She had "*no* discretion" with respect to the handling of Broumas' accounts, she asserts, because "once Mr. Pasztor approved a trade, [she] *could not*

refuse to execute it." *Id.* at 14. But Graham did have discretion. A registered representative can always refuse to execute a trade she knows may constitute a securities violation. *Cf. U.S. Envtl.,* 155 F.3d at 112 ("Like lawyers, accountants, and banks who engage in fraudulent or deceptive practices at their clients' direction, [the defendant broker] is a primary violator despite the fact that someone else directed the market manipulation scheme."). Of course, doing so might have made Graham's career at VCI more difficult, but fear of such consequences does not excuse a violation of the securities laws.

## C

■ The real question here concerns the third element of aiding and abetting liability: did Graham assist Broumas with the requisite scienter? We have held that knowledge or recklessness is sufficient to satisfy that requirement. *See Kowal v. MCI Communications Corp.,* 16 F.3d 1271, 1276 (D.C.Cir.1994); *SEC v. Steadman,* 967 F.2d 636, 641 (D.C.Cir.1992); *Zoelsch,* 824 F.2d at 36; *Dirks v. SEC,* 681 F.2d 824, 844–45 (D.C.Cir.1982), *rev'd on other grounds,* 463 U.S. 646, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983). We are satisfied that Graham acted with at least extreme recklessness in aiding Broumas' stock-kiting scheme.

The SEC did not hold Graham reckless merely for executing stock trades. Rather, during the course of executing some 60 trades, Graham noticed numerous suspicious circumstances. She observed that Broumas invariably specified the contra-broker for his trades, rather than using American Securities, the firm VCI typically contacted for over-the-counter trades in exchange-listed securities. Out of the more than 300 accounts with which Graham worked, only Broumas specified the contra-broker with whom to execute the trade, and only Broumas traded in such large volumes. He also detailed every as-

---

**21.** The defendant accounting firm had not issued the audit report, but rather had provided information to another accounting firm that had prepared the report. *See Zoelsch,* 824 F.2d at 34; *see also id.* at 28–29, 35–36.

pect of the trade, including the specific employee at the contra-broker with whom he wanted Graham to speak. *Cf. United States v. Corr*, 543 F.2d 1042, 1046 (2d Cir.1976) (recognizing directed trades as evidence of manipulation). Graham testified that, as a result, she assumed Broumas controlled the shares in the accounts or at least "had connections" with them.

Perhaps most important, Graham recognized, and discussed with Pasztor, the fact that Broumas had "a peculiar way of trading." J.A. at 306. Although these were "big money trades" involving thousands of shares, and although he was repeatedly buying and selling and paying commissions on the transactions, Graham realized that Broumas was not making any money on the trades. *See id.* at 380. This economically irrational trading was a large red flag. *See Edward J. Mawod & Co. v. SEC*, 591 F.2d 588, 595 (10th Cir.1979) (holding that broker willfully aided and abetted manipulative wash and match trades scheme when he "knew or had reason to know that such trading was economically irrational").

At the same time that she was noting these trading peculiarities, Graham also knew that Broumas was experiencing financial difficulties. She learned that he was buying and selling JML stock as a method of borrowing money he needed to repay bank loans. She knew that he was having trouble paying for his trades on time, had received "quite a few" extensions on his joint account, and had bounced checks. J.A. at 288, 296, 343. She knew that VCI's clearing firm had imposed restrictions on his joint account. And she knew that, with her help, Broumas was circumventing those restrictions by trading in accounts nominally owned by others. Moreover, when it came to her own firm's financial interests, Graham took special precautions to protect against financial loss, seeking Pasztor's authorization on almost every trade because "I couldn't take a chance of writing an order when the man would owe thousands of dollars in his account." *Id.* at 317. All of this provides more than the "substantial evidence" nec-

essary to support the SEC's finding of scienter on the part of Graham.

In her defense, Graham notes that she "stood to gain absolutely nothing from Broumas' scheme," since Broumas traded through a "house account" for which she did not receive commissions. Graham Br. at 27. It is true that lack of opportunity for personal gain may suggest lack of motive, which may in turn be relevant to the question of scienter. But the absence of commissions does not necessarily negate either motive or scienter. Graham may have gone along with Broumas' scheme (or hidden her head in the sand) to please her bosses or to keep her job. Or she may have done so merely because she was reckless, regardless of any motive to gain money or favor. Either way, the absence of commissions does not absolve her of responsibility. *See U.S. Envtl.*, 155 F.3d at 112 ("[A]s long as [broker], with scienter, effected the manipulative buy and sell orders, [his] personal motivation for manipulating the market is irrelevant in determining whether he violated § 10(b).").

Graham also points to the fact that she sought and obtained approval for Broumas' trades from her immediate supervisor, James Pasztor, who told her they were "fine." She "left it up to my supervisor," she states, to "say that this was not allowed." J.A. at 338. And she argues that this reliance negates the scienter necessary for an aiding and abetting violation. In support, Graham cites *James L. Owsley*, a case in which the Commission excused the conduct of a broker who, prior to selling his own stock in a company, was told by a firm official with whom he consulted that it was not necessary to disclose those sales to customers he was asking to purchase the same stock at the same time. *See* 51 S.E.C. 524, 528 (1993).

 The SEC rejected Graham's reliance defense, noting that she is an experienced professional who has an independent duty to use diligence "where there are any unusual factors." *Graham*, 1998 WL 823072, at *6–*7 & n. 30 (quoting *Alessandrini & Co., Inc.*, 45 S.E.C. 399, 406

(1973)). Registered representatives are "under a duty to investigate," *Hanly v. SEC,* 415 F.2d 589, 595 (2d Cir.1969) (internal quotation omitted), and "red flags and suggestions of irregularities demand inquiry as well as adequate follow-up and review," *Frederick H. Joseph,* 51 S.E.C. 431, 438 (1993). *See Wonsover,* 205 F.3d at 411. Given the abundance of red flags here, it would be very hard to characterize Graham's conduct as anything but extremely reckless, regardless of the approvals she received from Pasztor.

The Commission distinguished the *Owsley* decision on the ground that, "[a]mong other things, ... [it] involved a single, discrete inquiry and limited transactions." *Graham,* 1998 WL 823072, at *7 n. 34. Nor did *Owsley* mention the presence of any suspicious circumstances or red flags. By contrast, this case involved 60 transactions over 18 months, with Graham's involvement becoming increasingly more significant (e.g., through the establishment of the Les Girls account and the use of the Rogers account) at the same time that the warning signs were becoming increasingly more prominent.

Graham's reliance on Pasztor, a VCI employee, also differs substantially from the reliance at issue in *SEC v. Steadman,* where we held that directors of a mutual fund company had not been reckless in relying on a "formal, unqualified opinion letter" from their outside counsel—an opinion also relied upon by the funds' "disinterested independent auditor," a major national accounting firm. 967 F.2d at 642. There were no red flags in evidence in *Steadman,* nor were there suspicious events creating reasons for doubt. Indeed, there was no evidence at all that the

directors were on notice of the violation at issue, which arose from a failure to register the funds' securities under state Blue Sky laws, other than the SEC's view that "[s]ophisticated professionals like Steadman might be assumed to have come across [such] information ... at some point during" their careers. *Id.*

Graham, by contrast, was not simply a professional who should have known better. She was a professional who was aware of her customer's financial difficulties, aware that he was trading in a suspicious and economically irrational manner, and aware that he was trying to circumvent restrictions that had been placed on his account—yet she assisted him nonetheless. *Cf. Wonsover,* 205 F.3d at 411, 415 (holding, in light of "several 'red flags,'" that broker's reliance on approval of firm and its lawyers did not negate finding that he acted willfully). Accordingly, we reject Graham's reliance defense and affirm the SEC's determination that she recklessly, and substantially, assisted Broumas in violating the securities laws.[22]

**D**

Finally, Graham and Voss argue that the SEC is barred by principles of "equitable estoppel" and "administrative interpretation" from sanctioning them. They note that, "[f]rom late 1988 through mid–1989, the NASD had several occasions to review Broumas' directed trading in JML shares." Graham Br. at 33. The NASD concluded, petitioners assert, "that so long as Broumas' trades were not reported to the consolidated transaction reporting system of the exchanges, they were not manipulative." *Id.*[23] They also claim that "[t]he NASD sought the SEC's view with respect

22. Commissioner Johnson dissented from the finding of liability against Graham, solely on the ground that her reliance on the advice of Pasztor and Voss was reasonable. *See Graham,* 1998 WL 823072, at *11–*12 (Johnson, Comm'r, dissenting). Even he, however, found the case an "exceedingly close call[ ]," which "necessarily depend[ed] on the facts and circumstances." *Id.* While each SEC Commissioner may make his or her own fac-

tual determinations de novo," our standard of review requires deference to the determinations of the Commission where they are supported by substantial evidence.

23. NASD rules require that most transactions in stocks listed on the AMEX be reported on the "Consolidated Tape," NASD Manual, Sched. G, §§ 1(d), 2 (1989), which is the "consolidated transaction reporting system

to this administrative interpretation and the SEC concurred." *Id.* And they further contend that during 1988 and 1989, the SEC conducted its own examination of Broumas' trading, and "did not perceive" securities violations. *Id.* at 34.

At the start, it is important to describe accurately what transpired during the examinations in question. First, the NASD did not give Broumas' trades anything like a clean bill of health, and certainly did not do so in the form of an "administrative interpretation." An examiner simply concluded, in an internal review, that because Broumas' trades were not being included in the consolidated transaction reporting system, *see supra* note 23, they did not violate an NASD rule that proscribes wash trades undertaken for the purpose of creating the false appearance of market activity, *see* NASD Manual, Sched. G, § 4(b) (1989). The examiner was nonetheless troubled by the trades "because they didn't smell right. There was something fishy about these trades being prearranged, directed trades...." J.A. at 610; *see also id.* at 616–17. The NASD referred the matter of Broumas' trading to the SEC for further investigation. *See id.* at 608, 618, 804.

The SEC's role was even less formalized, and is of even less comfort to petitioners. The support petitioners cite for the proposition that "[t]he NASD sought the SEC's view with respect to this administrative interpretation and the SEC concurred" is no more than the NASD examiner's testimony that he spoke to someone at the SEC—whose name and title he

could not recall—who "basically agreed" with his evaluation. *Id.* at 610, 611. The support for petitioners' contention that the SEC "did not perceive" securities violations in reviewing Broumas' trading is the testimony of an SEC examiner, who said that after reviewing the NASD examination, he decided that "no conclusion could be reached as to whether any violative activities have occurred." *Id.* at 802. The SEC examiner therefore recommended that a "further review of Mr. Broumas's activities should be conducted in order to determine if insider trading or a check kiting scheme was being perpetrated." *Id.* at 803; *see also id.* at 659. Further review by the SEC eventually did result in the complaints at issue here.

Even in circumstances where the doctrine of estoppel is applicable,[24] the following elements, at least, must be established: that there was a "definite" representation to the party claiming estoppel; that the latter "relied on its adversary's conduct in such a manner as to change his position for the worse"; and that the reliance was "reasonable." *Heckler v. Community Health Servs.*, 467 U.S. 51, 59, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984) (internal quotations and footnote omitted). Here, neither the NASD nor the SEC made any representations at all to Graham or Voss, and petitioners do not assert that they acted in reliance on any such representations. Nor did either entity issue any kind of opinion or "administrative interpretation" that might have bound it, even as a matter of precedent, in a future adjudication.[25]

for the dissemination of last sale reports in [such] securities," *id.* § 1(b). Broumas' trades often were not reported.

**24.** *See Heckler v. Community Health Servs.*, 467 U.S. 51, 60, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984) ("[I]t is well settled that the Government may not be estopped on the same terms as any other litigant."); *see also Office of Personnel Management v. Richmond*, 496 U.S. 414, 419, 421–22, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990).

**25.** Of course, even if the NASD had done something to bind itself, that would not have

bound the SEC. As a private, nonprofit corporation, the NASD conducts its own independent investigatory and disciplinary actions, and is subject to limited review by the SEC. *See* 15 U.S.C. § 78s; 6 Loss & SELIGMAN, *supra*, at 2819–30. There is "no statutory, regulatory, or historical reference to support [an] argument that NASD discipline of its members was intended to preclude ... disciplinary action by the SEC itself against a securities professional." *Jones v. SEC*, 115 F.3d 1173, 1179 (4th Cir.1997).

Instead, what we have in this case is nothing more than a series of investigations into Broumas' trades, which ultimately provided the SEC with sufficient understanding of the underlying scheme to file the complaint now before us. Neither Broumas nor the petitioners can be said to have been cleared along the way. And the SEC's failure to prosecute at an earlier stage does not estop the agency from proceeding once it finally accumulated sufficient evidence to do so.[26]

## III

We conclude that substantial evidence supports the SEC's determination that Graham aided and abetted Broumas' violations of section 10(b) and Rule 10b–5. Because Voss' defense rested solely upon the exoneration of Graham, we also uphold the SEC's determination that he failed reasonably to supervise her. The order of the SEC is

*Affirmed.*

---

**26.** *See Investors Research,* 628 F.2d at 174 & n. 37 (rejecting estoppel argument where there was "no evidence the Commission learned all the facts of the violation" at early meetings with petitioners); *Capital Funds, Inc. v. SEC,* 348 F.2d 582, 588 (8th Cir.1965) (rejecting argument that the SEC was estopped because it previously investigated but took no action); *SEC v. Culpepper,* 270 F.2d 241, 248 (2d Cir.1959) (finding that routine examination provided "no fact-basis for an estoppel" because "neither the Commission nor its staff directly or indirectly caused the defendants to understand that it concurred in the legality of the [subject] sales"); *G.K. Scott & Co.,* 51 S.E.C. 961, 966 n. 21 (1994) ("A regulatory authority's failure to take early action neither operates as an estoppel against later action nor cures a violation.") (internal quotation omitted), *review denied,* 56 F.3d 1531 (D.C.Cir.1995) (table decision); *cf.* 15 U.S.C. § 78z ("No action or failure to act by the Commission ... in the administration of this chapter shall be construed to mean that the particular authority has in any way passed

upon the merits of, or given approval to, any security or any transaction or transactions therein ....").

In *Klein v. SEC,* 224 F.2d 861 (2d Cir.1955), cited by petitioners, the Second Circuit held that after an NASD committee had examined a broker's 50% markup and found no violation, it could not sanction him for charging the same markup two years later because the prior review "justified [the broker] in believing that a 50% markup did not violate the Rules." *Id.* at 864. The court regarded the NASD's earlier determination as "an interpretation of the Rules on which [the broker] reasonably relied." *Id. Klein* is of no assistance to petitioners, however, as they make no claim of reliance on the SEC's initial investigation. In any event, the Second Circuit subsequently appeared to limit *Klein* to actions of the NASD, holding that because the SEC enforces an "Act of Congress," it could not "be estopped even if it had acquiesced in" a transaction similar to the one it was now sanctioning. *Culpepper,* 270 F.2d at 248.