# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 14, 2005        Decided November 15, 2005

No. 04-1255

THE ROCKIES FUND, INC., ET AL.,
PETITIONERS

v.

SECURITIES AND EXCHANGE COMMISSION,
RESPONDENT

———

Consolidated with
04-1259

———

On Petitions for Review of an Order of the
Securities and Exchange Commission

———

*Edward J. Meehan* argued the cause for petitioners The
Rockies Fund, Inc., et al. With him on the briefs was *David E.
Carney*.

*David A. Zisser* argued the cause and filed the briefs for
petitioner John C. Power.

*Leslie E. Smith*, Senior Litigation Counsel, Securities &
Exchange Commission, argued the cause for respondent. With
her on the brief were *Giovanni P. Prezioso*, General Counsel,
and *Eric Summergrad*, Deputy Solicitor.

Before: SENTELLE and RANDOLPH, *Circuit Judges,* and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* SENTELLE.

SENTELLE, *Circuit Judge*: The Rockies Fund and directors Stephen Calandrella, Charles Powell, and Clifford Thygesen (collectively, "Rockies Fund petitioners") along with John Power petition for review of an order of the Securities and Exchange Commission ("SEC" or "Commission") sanctioning them for various violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5, among other provisions. Calandrella petitions for review of an additional sanction for violation of Section 57(k)(1) of the Investment Company Act of 1940. All petitioners argue that the SEC's findings lack substantial evidence. In addition, Rockies Fund petitioners ask us to vacate the sanctions imposed by the SEC.

We agree with Rockies Fund petitioners and Power that the SEC lacked substantial evidence for its finding of stock manipulation under Section 10(b) and Rule 10b-5. We also agree with petitioner Calandrella that the SEC lacked substantial evidence for its finding of a Section 57(k)(1) violation. The SEC's findings of Section 10(b), Rule 10b-5, and other violations for improper securities disclosures are supported by substantial evidence. Accordingly, we grant the petition for review, partially vacate the Commission's order, and remand for further proceedings.

I.  Background

A.  Factual Background

The events giving rise to this action occurred between 1993 and 1995. During that time, Stephen Calandrella, Charles

Powell, and Clifford Thygesen served as directors of the Rockies Fund and as officers or directors of the Fund's portfolio companies. Registered as a business development company, *see* 15 U.S.C. § 80a-2(a)(48), the Rockies Fund was required to manage its portfolio companies.

Prior to this period, petitioner John Power, his brother Mark, and Raymond Stanz ran a line of "faux" jewelry stores called Mirage Concepts. In 1993, Power sought to expand Mirage by acquiring the assets of a bankrupt competitor. To raise the needed capital, Power collaborated with his friend Calandrella. They used one of Calandrella's companies, a shell corporation called Silver State Casinos, as an acquisition vehicle. They named the new endeavor Premier Concepts, Inc., and sought NASDAQ listing. Suffering early disappointments, Premier did not achieve NASDAQ listing until 1997.

In February 1994, Premier conducted a private placement of stock and warrants. The stock was initially priced at $1.00 per share. The Rockies Fund participated in Premier's acquisitions and purchased Premier shares in 1994 and 1995. In March 1994, Stanz took control of Premier. Friends and relatives purchased the bulk of shares, but the stock generated little further interest. Despite the inactivity, Premier apparently never attempted to foster market interest through solicitation.

Ranald Butchard, friend to both Power and Calandrella, purchased 200,000 shares in Canada during the initial offering pursuant to SEC Regulation S, which governs securities sales made outside the United States. *See* 17 C.F.R. §§ 230.901-.905 (2005). Holding roughly twenty percent of the outstanding shares, he became Premier's largest investor. When Premier failed to meet NASDAQ listing requirements, Butchard inquired about selling his shares. Power and Calandrella agreed to find purchasers for Butchard's shares because of the stock's thin

market.

Butchard subsequently sold 180,000 shares between June and September 1994. Because he had purchased his stock under Regulation S, his shares were restricted by Regulation S's resale provision and therefore not freely tradeable. Counsel advised Butchard that he could not legally sell his shares unless he sold publicly. The shares went first to Premier's market-maker, Hanifen Imhoff, and were then bought by associates of Calandrella, Power, and Butchard. Purchasers included Nathan Katz and Arthur Nacht, both of whom learned of Premier through Callendrella. Katz made purchases of 25,000 shares on June 15, 10,000 shares on June 30, and 10,500 shares on August 19. Calandrella lent Katz money for at least some of the purchases. Nacht made a single purchase of 10,000 shares on August 30. Other purchasers included Power's personal companies, Power Curve and Redwood, and his brother, Brian Power. Power Curve and Redwood each bought 25,000 shares on June 15 and June 23, respectively. Brian Power bought 7,000 shares on June 17. Power also arranged for a business associate, under the name Neon Rainbow, to purchase 10,000 shares on June 17. Rounding out the trades, Butchard found a few buyers himself.

John Power also owned a number of shares. Power engaged in what he admitted to be "wash sales," buying Premier stock from, and/or selling it to, entities that he controlled, as well as his brother Brian, with whom he apparently did not have an arms-length relationship. Power testified that he undertook the transactions (1) to take advantage of the settlement policies of his Canadian broker, which allowed him, by way of trades between his accounts, to receive *de facto* short-term loans from that broker, apparently in the same way that a U.S. investor, conducting a wash sale between a U.S. margin account and some other account, receives a loan from the broker for the

margin account; and (2) to generate cash for himself or his brother, depending on whoever needed it most at the moment. On July 8, John Power purchased 5,000 shares from his brother and 14,000 shares from Power Curve. He then sold 17,000 shares back to Power Curve on July 25. Power Curve sold 14,000 shares to Brian Power on August 17. Brian then sold 14,500 shares to his brother John on August 25. Brian Power made a further 1,500 share sale to Power Curve on September 19. Finally, on October 21, John Power sold 4,250 shares, 2,500 to his own IRA account and 1,750 to his minor child.

Over the bulk of Butchard's trades in June 1994, Premier's price fluctuated from $1.00 to $1.25. Power's trades from July until October, combined with Butchard's remaining August trades, took place during a period of consistent price increases for Premier stock. From $1.25 in June, the stock rose to $2.50 by October 21. A few months after the last of Power's trades, the price had returned to $1.00 per share.

The Rockies Fund also took part in Premier's initial offering. It held over 100,000 shares of restricted Premier stock and an additional 750 unrestricted shares. *See* 17 C.F.R. § 230.144(a)(3) (2005) (defining restricted securities). The restrictions limited the Fund's ability to trade the shares, which accounted for between ten and forty percent of Fund assets. In six quarterly reports to the SEC, though, the Fund incorrectly listed all of its Premier shares as unrestricted.

In the same quarterly filings, the Fund used the quoted market price for unrestricted shares as the value for its Premier holdings. That method did not comport with the methods listed in its 1983 prospectus, which required the Fund to discount restricted shares from the unrestricted market price. Generally accepted accounting practice also called for discounting restricted stock. Under methods approved by outside counsel

6

Clifford Neuman, however, the Fund did not discount its restricted shares.

The Fund claimed an additional 200,000 Premier shares in its SEC filing of September 30, 1995. The purchase stemmed from an oral agreement negotiated by Power. The Fund's board, however, did not approve the purchase until November 15, 1995, or pay for the shares until December 1995.

The Fund's involvement with Premier extended beyond share ownership and into management. During Premier's nascent stages, Power and Calandrella had a managerial dispute, which resulted in Power's withdrawal from Premier and Stanz's replacement by one of Calandrella's associates. After Stanz was removed as head of Premier, he threatened to sue both the Fund and Calandrella. Under the provisions of a settlement agreement, the Fund agreed to buy Stanz's 85,000 shares for $85,000. In addition, the Fund, Stanz, and Calandrella all signed a mutual release from liability for events surrounding Premier's acquisitions. Calandrella signed the mutual release without discussing it with other Fund directors.

## B. Procedural Background

The SEC instituted administrative proceedings against petitioners under Section 10(b) of the Securities Exchange Act of 1934, Rule 10b-5, and other provisions. Following an evidentiary hearing, the ALJ's initial decision found that Power and Calandrella had violated Section 10(b) and Rule 10b-5 by manipulating Premier's stock through matched orders and wash sales. The ALJ also found that the Fund had violated Section 10(b) and Rule 10b-5, as well as Section 13(a) and Rules 12b-20, 13a-1, and 13a-13, by misclassifying, overvaluing, and misrepresenting ownership of Premier stock in quarterly SEC filings. Further, the ALJ found Calandrella in violation of

Section 57(k)(1) of the Investment Company Act and Rule 10b-5 for improperly accepting compensation and not reporting the consequent conflict of interest to the board.

The ALJ imposed sanctions of $500,000 on Calandrella and $160,000 each on Powell and Thygesen. The ALJ further imposed a cease and desist order against all petitioners. Finally, the ALJ permanently barred Calandrella and temporarily barred Powell and Thygesen from associating with an investment company.

The SEC conducted a de novo review of the ALJ's decision. Its opinion affirmed the ALJ's ruling. All petitioners sought reconsideration, but the SEC denied the request. The Fund and Power now petition this Court for review of the SEC's opinion and its order denying reconsideration. *See* 15 U.S.C. §§ 78y(a)(1), 80a-42.

## II. Standard of Review

"The findings of the Commission as to the facts, if supported by substantial evidence, are conclusive." 15 U.S.C. § 78y(a)(4); *see also Graham v. SEC*, 222 F.3d 994, 999 (D.C. Cir. 2000). A reviewing court may, however, set aside the SEC's conclusions of law if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Graham*, 222 F.3d at 999-1000.

## III. Substantive Violations

### A. Stock Manipulation

In the context of securities transactions, Section 10(b) prohibits the use of "manipulative or deceptive device[s] or contrivance[s] in contravention of" the SEC's rules, including

Rule 10b-5. 15 U.S.C. § 78j(b). Rule 10b-5 prohibits the use of fraudulent devices in securities transactions. 17 C.F.R. § 240.10b-5(a). Matched orders and wash sales, both of which the SEC found here, may constitute violations under Section 10(b) and Rule 10b-5. A matched order is a securities purchase or sale entered with the knowledge that a reciprocal order of substantially the same amount would be entered at substantially the same time for substantially the same price. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 205 n.25 (1976). "Wash sales are transactions involving no change in beneficial ownership." *Id.* (internal quotations omitted).

Nearly all of Butchard's sales fit the definition of matched orders: Buyers recruited by Calandrella and Power purchased in quantities and at times that corresponded with Butchard's sales. Not having changed the shares' beneficial ownership, Power's trades among his own companies likewise meet the definition of wash sales. Neither Calandrella nor Power disputes these SEC findings. Calandrella quibbles with the SEC's characterization of his participation in the Katz and Nacht trades, but at root he does admit to his involvement with the trades. Power admits that he participated in both matched orders and wash sales.

But neither of these devices alone constitutes a securities violation. Section 10(b) (and, accordingly, Rule 10b-5) also requires a showing of intent and materiality. The parties disagree about what standard of intent applies under Rule 10b-5. Petitioners argue for a specific intent standard, but the SEC contends that recklessness should suffice. Petitioners point to Section 9(a)(1) of the 1934 Act, which expressly outlaws matched orders or wash sales conducted "[f]or the purpose of creating a false or misleading appearance of active trading" of a registered security on a national exchange. 15 U.S.C. § 78i(a)(1). They argue that a lower standard of intent under

Rule 10b-5 would undermine Section 9(a)(1)'s specific intent standard.

Whereas Section 9(a)(1) requires a showing of specific intent, Rule 10b-5 generally requires only "extreme recklessness." *SEC v. Steadman*, 967 F.2d 636, 641 (D.C. Cir. 1992). Extreme recklessness is an "extreme departure from the standards of ordinary care, . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.* at 642 (internal quotations omitted) (alteration in original). In other words, extreme recklessness requires a stronger showing than simple recklessness but does not rise to the level of specific intent. The difference between the standards could potentially have significant effects on the interplay between Section 10(b) and Section 9(a)(1) and SEC actions under each provision. Because we conclude that the SEC has not met its burden of proving scienter under either standard, we need not reach the question of what standard of intent should be applied to matched orders and wash sales under Section 10(b) and Rule 10b-5.

Treating each set of trades separately, we first look at Butchard's matched orders. After deciding to dump his Premier stock, Butchard conducted all of his sales in the public market based on the advice of counsel. The SEC questioned the need for public sales, though, suggesting Butchard could have avoided transaction costs by selling privately. The SEC noted that a public sale signals market activity to investors. It concluded that, in the absence of a transaction costs benefit, the only purpose for publicly reporting the sales would have been to create an appearance of market activity. On this reasoning, the SEC found that Power and Calandrella intended to manipulate the market.

Petitioners Calandrella and Power each dispute the SEC's conclusion and proffer alternative explanations for their actions. They contend that securities laws forced Butchard to sell publicly. At the very least, they say, Butchard's counsel advised him that, if he wanted to sell the stock, he could only do so in this fashion. Furthermore, they argue that a private sale would have incurred more transaction costs than a public sale.

We conclude that the SEC's findings are unsupported by the record evidence. The record shows that Butchard chose to sell his shares on the public market for reasons wholly independent of Calandrella and Power. The SEC made no finding that petitioners induced him to sell initially; neither did it find that they later coerced him into selling publicly. Indeed, other evidence suggests SEC rules required the trades to be made publicly. Testimony before the ALJ shows that Butchard's counsel advised him that he could not legally sell his shares privately because of their Regulation S restrictions. Although the SEC's brief suggests Butchard need not have publicly sold his shares, counsel at oral argument all but admitted otherwise. Having virtually conceded that Butchard's trades needed to be public, the SEC has essentially abandoned the main evidentiary leg propping up its findings.

Without evidence that Calandrella and Power induced Butchard's sales, some other evidence must exist to uphold the SEC's decision. The SEC suggests that Calandrella and Power colluded in arranging Butchard's sales, hinting that the alleged collusion included price setting. Although collusion is not necessary for a finding of intent, it is probative. Both Calandrella and Power challenge the SEC's insinuation, asserting that they did not collaborate at all on Butchard's trades, let alone on the prices of those trades. As support, they point to their well-known feud over Premier's management.

11

The SEC concluded—correctly—that a managerial rift between the two would not have precluded the possibility of cooperation in other areas.  That conclusion, however, does not provide any affirmative evidence of actual collusion and certainly not evidence of collusion about something as specific as setting Premier's stock price.  As its only evidence of collaboration, the SEC points to two facts:  a single piece of testimony by Calandrella and the general pattern of Butchard's trades.  The SEC reads far too much into Calandrella's testimony and explains far too little about the supposed trading pattern.

During the hearing, Calandrella was asked if he contacted Power or Hanifen Imhoff, the market-maker, about unexpected trades of Premier stock.  Calandrella responded that he did inquire.  He did not specify, however, that he talked to Power, and he only referred to unfamiliar trades.  Standing alone, this vague colloquy does not establish any systematic collaboration between the two men.  And even if the evidence does establish some level of cooperation between the two, it clearly does not establish manipulative price setting.

With respect to Premier's trading pattern, the SEC says very little.  With no explanation, it announces that a pattern exists and that it suggests cooperation between Calandrella and Power.  No pattern is immediately apparent from the record, however.  The Commission's conclusion requires an explanation; without it, the SEC has acted arbitrarily and capriciously.  *See Jost v. Surface Transp. Bd.*, 194 F.3d 79, 85 (D.C. Cir. 1999) (quoting *Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1404 (D.C. Cir. 1995)).

The SEC cited other evidence for its finding.  It argues before this Court that sales like Butchard's should have depressed Premier's share price:  Large sales by the largest shareholder of a thinly traded company with poor fundamentals

generally create downward pricing pressure. The SEC's brief concludes that Calandrella and Power therefore acted to buoy Premier's shares artificially by supplying buyers for Butchard's shares. Despite any merit the argument may have, the SEC has made it before the wrong tribunal. If this conclusion formed part of the SEC's reasoning, then it should have appeared in the SEC's opinion. *See America's Cmty. Bankers v. FDIC*, 200 F.3d 822, 835 (D.C. Cir. 2000) ("[*P*]*ost hoc* rationalizations cannot support an affirmance of an agency decision based on an otherwise invalid rationale.").

Turning to Power's wash sales and matched orders, the SEC offers a few unrelated propositions that it believes establish a pattern of intentional manipulation. In conclusory fashion, the SEC suggests that Power's cash-generating transactions could not have been worth the transaction costs. It also links Brian Power's transaction costs with the supposed manipulative intent of his brother. The SEC fails to articulate why the transaction costs were too high, and it makes no findings as to what level of costs would have made the trades unpalatable. Further, the SEC emphasizes that, at the end of the series of wash sales, Brian ended up with a large position in Premier stock, which the agency considers inconsistent with Brian's story that he suffered cash-flow problems that, in turn, motivated his participation in the wash sales. John testified, however, that the movement of cash between himself and his brother was a "two-way street," in which money went to whoever needed it most. Thus, Brian's ultimate position in Premier stock is not inconsistent with the brothers' story, assuming that John had greater need of cash when the sales ended. The SEC's lack of explanation suggests the SEC found intent based on the mere existence of wash sales and matched orders. But the simple fact that a party has conducted a matched order or wash sale (or a series of them) does not establish manipulative intent of any kind.

The Commission asserts that a finding that petitioners acted recklessly can satisfy the scienter requirement, but the Commission does not appear to have made any factual findings to support this. In the securities fraud context, extreme recklessness is not a lesser-included form of specific intent. *See Howard v. SEC*, 376 F.3d 1136, 1143 (D.C. Cir. 2004). The Commission made no findings that petitioners' actions were an "extreme departure" from a relevant standard of care, or that they would "so obvious[ly]" create a "danger of misleading buyers or sellers" that they "must have been aware of [the danger]." *Steadman*, 967 F.2d at 641.

Because the record conflicts with the SEC's scienter findings under any standard of intent, its finding of a Rule 10b-5 violation for manipulation is not supported by substantial evidence.

## B. SEC Disclosure

Under Rule 10b-5, it is unlawful for anyone, in connection with a security transaction, "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements . . . not misleading . . . ." 17 C.F.R. § 240.10b-5(b). The Supreme Court has defined materiality under Section 10(b) and Rule 10b-5 as "a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (internal quotation and citation omitted). The Court further explained that if there is a substantial likelihood that a reasonable investor would have viewed the misleading or omitted fact as "significantly alter[ing] the total mix of information," it is material. *Id.* (internal quotation marks and citation omitted).

The SEC found Rockies Fund petitioners in violation of Section 10(b) and Rule 10b-5, as well as Section 13(a) and Rules 12b-20, 13a-1, and 13a-13, for filing misleading quarterly and yearly disclosures. Specifically, the SEC found three kinds of violations—misclassification, overvaluation, and improperly claimed ownership of Premier stock. According to the SEC, Rockies Fund petitioners misclassified and overvalued Premier stock in five quarterly filings in 1994 and 1995 and its 1994 yearly filing. Additionally, the SEC determined that the Fund misreported ownership of 200,000 Premier shares in its September 30, 1995, quarterly filing.

### 1. Misclassification

Rockies Fund petitioners admit that the Fund misclassified its Premier holdings in several SEC filings. Those filings incorrectly labeled the vast majority of the Fund's shares of Premier stock as unrestricted when only 750 were actually held as unrestricted shares. The Fund should have listed the shares as restricted in each filing; listed as unrestricted, the statements qualify as "untrue" under Rule 10b-5.

The Fund petitioners do, however, challenge the materiality of the misclassification. In its opinion, the SEC determined that the misclassifications were material in two ways. First, the misclassifications affected the value of the Premier holdings—and, therefore, the Fund's financial statements. Second, the misclassifications caused the Fund's holdings to appear more liquid than they really were. In addition, Premier occupied a large percentage of the Fund's total assets, magnifying the effect of any misinformation about Premier. Under these circumstances, a reasonable investor certainly would have viewed the misclassification as "significantly alter[ing] the 'total mix' of information." *See Basic, Inc.*, 485 U.S. at 231-32 (citation omitted).

The Rockies Fund petitioners also argue that they lacked the requisite intent under Rule 10b-5. The SEC found it "implausible" that the Fund directors could have overlooked this kind of error in six separate filings. The Fund weakly disputes the SEC's scienter determination, but the SEC's opinion has ample support. Premier represented a large part of the Fund's holdings—between ten and forty percent. An attentive director would have rectified the error absent extreme abdication of ordinary care. In addition to the simple misclassification, each filing used valuation language only appropriate for unrestricted shares. Therefore, substantial evidence supports the SEC's finding of reckless indifference and "extreme recklessness."

## 2. Overvaluation

Examining the same quarterly filings, the SEC also found that the Fund overvalued its Premier holdings. The SEC centered its analysis on the Fund's 1983 prospectus, the Fund's only public statement on valuation procedures. The prospectus endorsed four methods of valuation, none of which the Fund used to value Premier. Instead, the Fund settled on the "quoted market price" as Premier's value. The SEC found that, unmoored from its prospectus, the Fund used an ad hoc process that mainly consisted of rubber-stamping Calandrella's recommendations. The SEC concluded that the prospectus—and good accounting practice—would have directed a different approach: valuing restricted stock by discounting the shares from the unrestricted market price.

According to the SEC, standard accounting practice supports the prospectus's methodology and regards it as improper to value restricted stock at the unrestricted market value. The SEC determined that discounting would have resulted in an appreciably lower valuation. Petitioners offered no evidence of a discernible reason for choosing market price as

the appropriate value. Accordingly, we find the SEC's overvaluation findings are supported by general accounting practice and the Fund's own prospectus.

The Fund counters that, even if it technically overvalued Premier stock, the prospectus sheds no light on the materiality of the valuation. Furthermore, it says the overvaluation, if any, caused no actual harm. Materiality, however, does not require a showing of actual harm to investors. *Graham*, 222 F.3d at 1001 n.15. The SEC supported its finding of materiality, concluding that an overvaluation of the Fund's largest asset would have been significant information for potential Fund investors. In addition, as the Fund's only public statement about valuation, the prospectus does contribute to the overvaluation's materiality. Because the Fund rejected its publicly stated valuation procedures and did not discount its largest holding, substantial evidence supports the SEC's finding.

Citing the Fund's inconsistent and slipshod valuation methodology, the SEC found a reckless disregard for the accuracy of Premier's stock valuations. The Fund disputes the finding, claiming reliance on counsel for procedures adopted in 1994. But even if true, much of the testimony showed that the Fund used no set procedure—whether developed by counsel or not—for valuing its holdings, instead generally relying on Calandrella's recommendation to the board. Such a haphazard process for valuing the largest holding of the Fund constitutes an "extreme departure from the standards of ordinary care" that should have been obvious to all the Fund's directors. *See Steadman*, 967 F.2d at 641-42.

### 3. Ownership

The SEC found that the Fund falsely claimed ownership of an additional 200,000 Premier shares in its September 1995

filing. Rockies Fund petitioners claim that the Fund had made a valid oral agreement for the shares in time for its September 1995 quarterly report. The SEC found otherwise, concluding that the oral agreement lacked two essential elements, price and amount, required by Colorado contracts law.

The parties dispute the meaning of the relevant statute. For securities transactions, Colorado law at the time required a writing "sufficient to indicate that a contract has been made for sale of a stated quantity of described securities at a defined or stated price." Colo. Rev. Stat. Ann. § 4-8-319(a) (West 1995) (repealed 1996). This provision requires the contract to have a defined quantity and price, but the Fund asserts that the amount and price need not be set until the time of the writing. The contract, however, is the oral agreement, not the writing. The oral contract itself must have the defined quantity and price in order to be valid. Therefore, the Fund did not establish ownership until its directors approved the purchase amount and price in November 1995, well after the September filing.

The 200,000 shares comprised 46% of the Fund's Premier holdings and 11% of its total securities holdings. The SEC substantiated its finding that the ownership error was material based on the magnitude of the impact such a purchase would have on the Fund.

The SEC also found the requisite scienter. Calandrella, as agent, personally participated in the negotiations and knew the status of the purchase agreement. When he approved the quarterly report and its associated misrepresentation, he acted with at least extreme recklessness. Accordingly, substantial evidence supports the SEC's finding of a Section 10(b) and Rule 10b-5 violation.

18

## C. Release and Compensation

For business development companies, Section 57(k)(1) of the Investment Company Act of 1940 makes it unlawful for any "agent[] to accept from any source any compensation (other than a regular salary or wages . . .) for the purchase or sale of any property" on behalf of his employer, "except in the course of such person's business as an underwriter or broker." 15 U.S.C. § 80a-56(k)(1). The SEC found that Calandrella violated this provision by accepting the release of Stanz's legal claims as compensation in return for the Fund's purchase of Stanz's stock interest in Premier. The SEC also found Calandrella in violation of Rule 10b-5 for not reporting the release to the Rockies Fund's board of directors.

The SEC dismissed Calandrella's claims that the release was worthless to him. It concluded that the waiver benefited Calandrella by ensuring that he would not be liable to Stanz. Though not disputing that Stanz's legal claims lacked merit, the SEC stated that no lawsuit's outcome can be infallibly predicted. The Fund's outside counsel, however, testified that he examined Stanz's potential claims and found them meritless.

Unquestionably, some legal claims are facially hollow. To fulfill its evidentiary obligations, the SEC must do more than globally declare that even frivolous lawsuits might succeed. The SEC's findings must be specific to the issue before it—does this particular release have value? The SEC made no specific findings as to Stanz's claim yet paid no heed to the Fund's evidence. The SEC's generalizations, not drawn from the record, do not constitute substantial evidence for the SEC's finding that the release had value for Calandrella.

Having determined that the SEC's finding of a Section 57(k)(1) violation lacks substantial evidence, we also decide that

the corresponding Section 10(b) and Rule10b-5 violations lack substantial evidence. Those findings stem entirely from the determination that the waiver was compensation and accordingly are unsupported.

## IV. Sanctions

Having found violations, the SEC levied sanctions against the Rockies Fund petitioners and on petitioner Power. The SEC imposed cease and desist orders on each individual petitioner. It also imposed monetary sanctions on petitioners Calandrella, Thygesen, and Powell, but not petitioner Power. Calandrella received a penalty of $500,000. Thygesen and Powell each received a penalty of $160,000.

The monetary sanctions imposed by the SEC amount to the harshest available—third-tier sanctions. To impose third-tier sanctions, the SEC must show that the violations "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons or resulted in substantial pecuniary gain to the person who committed the" violations. 15 U.S.C. § 80a-9(d)(2)(c). The SEC found that this standard applied but did not even cursorily explain either element. One could say the entire opinion, charitably read, provides the analysis for the first prong. As to the second prong, however, the SEC gives no explanation of how petitioners' conduct either resulted in or created a significant risk of substantial loss to others. Neither does it give support for a finding of pecuniary gain. In sum, the SEC's analysis was not just superficial; it was nonexistent. Accordingly, because the SEC did not explain its reasoning, we hold that the SEC arbitrarily and capriciously imposed third-tier sanctions on the petitioners. *See Jost v. Surface Transp. Bd.*, 194 F.3d 79, 85 (D.C. Cir. 1999) (quoting *Dickson v. Sec'y of*

*Def.*, 68 F.3d 1396, 1404 (D.C. Cir. 1995)).  We vacate the sanctions and remand to the agency for further proceedings.

## V.  Conclusion

For the foregoing reasons, we grant the petition for review, partially vacate the Commission's order, and remand for further proceedings not inconsistent with this opinion.