In the

# United States Court of Appeals
## For the Seventh Circuit

_____

Nos. 07-2466, 07-2467

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee*,

*v.*

MELVIN R. LYTTLE and PAUL E. KNIGHT,

*Defendants-Appellants*.

_____

Appeals from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:03-CV-1513—**Sarah Evans Barker**, *Judge*.

_____

ARGUED MAY 16, 2008—DECIDED AUGUST 7, 2008

_____

Before BAUER, POSNER, and WOOD, *Circuit Judges*.

POSNER, *Circuit Judge*. Melvin R. Lyttle and Paul E. Knight were charged (along with others, not before us) in a civil case brought by the SEC with perpetrating a "prime bank" fraud. This is a common fraud in which the perpetrators solicit investments by telling prospective investors that the investors' money will be invested in high-yield bank-issued securities not available or even known to the general public. (For further description, see SEC, "Investor Alert: How Prime Bank Frauds

Work," Sept. 15, 2000, www.sec.gov/divisions/enforce/
primebank/howtheywork.shtml (visited July 21, 2008);
SEC, "Investor Alert: Warning to All Investors About
Bogus 'Prime Bank' and Other Banking-Related Investment
Schemes," www.sec.gov/divisions/enforce/primebank.
shtml (visited July 21, 2008).) The district judge granted
summary judgment for the SEC on a variety of counts,
awarded injunctive relief, and assessed monetary penalties.

Lyttle and Knight appeal only from the imposition of
the penalties, $110,000 on each of them. That amount
was proper only if the SEC proved that these defendants
engaged in fraud, 15 U.S.C. §§ 77t(d)(2)(C)(i),
78u(d)(3)(B)(iii)(aa); 17 C.F.R. § 201.1001 and pt. 201, subpt.
E, tab. I; see *SEC v. Kern*, 425 F.3d 143, 153 (2d Cir. 2005);
*Rockies Fund, Inc. v. SEC*, 428 F.3d 1088, 1099 (D.C. Cir.
2005)—that is, if it proved "scienter," *Aaron v. SEC*, 446 U.S.
680, 697 (1980); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185,
201 (1976), meaning that the defendants either knew that
the representations they made to investors were false or
were reckless in disregarding a substantial risk that they
were false. *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513
F.3d 702, 704 (7th Cir. 2008); see also *Sundstrand Corp. v.
Sun Chemical Corp.*, 553 F.2d 1033, 1044 (7th Cir. 1977)
("a reckless omission of material facts upon which the
plaintiff put justifiable reliance in connection with a
sale or purchase of securities is actionable under Section
10(b) as fleshed out by Rule 10b-5"); *SEC v. Infinity Group
Co.*, 212 F.3d 180, 192 (3d Cir. 2000); *Meadows v. SEC*, 119
F.3d 1219, 1226-27 (5th Cir. 1997). Although the Supreme
Court has "previously reserved the question whether
reckless behavior is sufficient for civil liability under
§ 10(b) and Rule 10b-5," it has noted that "every Court of
Appeals that has considered the issue has held that a

plaintiff may meet the scienter requirement by showing that the defendant acted intentionally or recklessly, though the Circuits differ on the degree of recklessness required." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2507 n. 3 (2007).

The defendants argue that because scienter is a state of mind, summary judgment can almost never be granted in favor of a plaintiff who has the burden of proving scienter, as the SEC did. For it is always possible, they say, that a reasonable jury would credit a defendant's testimony that he believed the representations were true. The premise of the argument—that scienter is a state of mind—requires qualification. In our recent *Makor* decision (cited earlier), elaborating on the proposition stated in earlier cases that proof of recklessness can establish scienter, we noted that "a popular definition of recklessness in this context [proof of scienter in a securities fraud case] is 'an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.' This looks like two criteria—knowledge of the risk and how big the risk is—but as a practical matter it is only one because knowledge is inferable from gravity ('the danger was either known to the defendant or so obvious that the defendant must have been aware of it'). When the facts known to a person place him on notice of a risk, he cannot ignore the facts and plead ignorance of the risk." 513 F.3d at 704 (citations omitted).

Even when a party's subjective beliefs are critical to liability, it is not always true that the case cannot be decided on summary judgment—as the present case illustrates. The defendants are under indictment for fraud

and refused to testify in this case. Their refusal is privileged by the self-incrimination clause of the Fifth Amendment. But the consequence of their refusal is that they cannot testify to their state of mind. Without such testimony to contradict the mountain of circumstantial evidence (circumstantial with regard to the defendants' inmost beliefs, at any rate) that the SEC presented, evidence reinforced by the inference (permissible in a civil case) of guilt from their refusal to testify, as in *SEC v. Colello*, 139 F.3d 674, 677-78 (9th Cir. 1998), no reasonable jury could doubt that they had acted with scienter, see *LaSalle Bank Lake View v. Seguban*, 54 F.3d 387, 391-92 (7th Cir. 1995); *Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1264 (9th Cir. 2000), whatever the precise definition of the word.

To begin with, they extracted the remarkable total of $32 million from 31 investors (the minimum investment was $1 million) with typical "prime bank" representations. Not only did they pocket several million dollars of the invested money for their personal use (personal use that included the purchase by one of the defendants of a gazebo and a custom-built piano) rather than investing the money in the no-risk trading program that they had promised the investors they would invest it in; but what they did invest they invested in a company that engaged in high-risk, not no-risk, trading. They falsely stated to the investors that the investments were insured—up to 196 percent of the original investment. They were not insured. One of the defendants promised investors a return of 100 percent *per week*, told them their investments were being monitored by the Federal Reserve Board, and warned them that "unauthorized communications" about the investments would lead to their being "blackballed by the Federal Reserve." When investors inquired how their

investments were doing, the defendants falsely stated that the money had been temporarily placed in U.S. Treasury notes.

In the absence of contrary evidence, and there was none as we are about to see, the brief summary that we have given would have left a reasonable jury with no alternative to inferring scienter. *SEC v. Jakubowski*, 150 F.3d 675, 681-82 (7th Cir. 1998); *SEC v. George*, 426 F.3d 786, 795 (6th Cir. 2005); see *In re Chavin*, 150 F.3d 726, 728-29 (7th Cir. 1998); *United States v. Premises Known as 717 S. Woodward St.*, 2 F.3d 529, 534 (3d Cir. 1993); *United States v. One Parcel of Property Located at 15 Black Ledge Drive*, 897 F.2d 97, 102 (2d Cir. 1990). For it is inconceivable that the defendants could have believed the cascade of fantastic lies that they told the investors.

They present three defenses, which we'll call the "I am just a copying machine" defense, the "honor among thieves" defense, and the "better liar" defense. To establish the first defense they argue that they merely repeated misrepresentations that defendant Gail Eldridge (not an appellant), who seems to have been the moving spirit in the prime-bank scheme, made to them. That is not true, but if it were it would not avail them. One doesn't have to be the inventor of a lie to be responsible for knowingly repeating it to a dupe. The defendants could not have thought that the fact that Eldridge told them something implausible (to put it mildly) made it true.

Their second defense is that Eldridge defrauded *them*, as shown by the fact that she pocketed the lion's share of the $32 million stolen from the investors. The defendants, however, pocketed almost $9 million, and even if Eldridge took more than her fair share of the loot, that would not exonerate them. One is reminded of the high-

wayman's case. *Everet v. Williams* (Ex. 1725), belatedly reported in Note, "The Highwayman's Case," 9 *L.Q. Rev.* 197 (1893); see W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 50, p. 336 n. 4 (5th ed. 1984); *Byron v. Clay*, 867 F.2d 1049, 1051-52 (7th Cir. 1989); *United States v. Kravitz*, 281 F.2d 581, 583-84 n. 3 (3d Cir. 1960). One highwayman sued another, claiming that he was entitled to a larger share of the loot from a series of joint robberies. The suit was dismissed, both were hanged, and the plaintiff's lawyers were fined for having brought a suit "both scandalous and impertinent."

The third defense is that the defendants believed the false representations that they made because the investors believed them. In other words, if a lie is skillful enough to deceive the person lied to, it must have deceived the liar as well.

Enough said.

AFFIRMED.