# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued February 6, 2012                    Decided June 19, 2012

No. 11-1082

DAN RAPOPORT,
PETITIONER

v.

SECURITIES AND EXCHANGE COMMISSION,
RESPONDENT

On Petition for Review of an Order
of the Securities & Exchange Commission

*Michael Hanin* argued the cause for petitioner. With him on the briefs was *Leigh McMullan-Bellas*.

*Jeffrey A. Berger*, Senior Counsel, Securities and Exchange Commission, argued the cause for respondent. With him on the brief were *Michael A. Conley*, Deputy General Counsel, *Jacob H. Stillman*, Solicitor, and *John W. Avery*, Deputy Solicitor.

Before: SENTELLE, *Chief Judge*, GRIFFITH, *Circuit Judge*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Chief Judge* SENTELLE.

SENTELLE, *Chief Judge*: Dan Rapoport, a Russian citizen, petitions this Court to review the Default Order the Securities

and Exchange Commission (SEC or the Commission) entered against him for failing to respond to administrative proceedings initiated by the Commission on allegations that Rapoport violated Section 15(a) of the Securities Exchange Act of 1934 (Exchange Act). Among other things, Section 15(a) prohibits brokers and dealers from soliciting U.S. customers to engage in any securities transaction unless the broker or dealer is registered with the SEC or a U.S. self-regulatory organization. Rapoport argues that the Commission arbitrarily applied Exchange Act Rule 155(b), 17 C.F.R. § 201.155(b), which gives the Commission discretion to set aside default orders "for good cause shown."

We agree with Rapoport that the Commission's application of Rule 155(b) was inconsistent with its precedent and therefore arbitrary. Accordingly, we grant the petition for review, vacate the Commission's order denying Rapoport's motion to set aside the default entered against him, and remand for further proceedings.

## I. Background

Because the procedural background of this case lies at the heart of Rapoport's petition, we provide here a detailed summary of the events culminating in our review of this matter.

### A. The Order Instituting Proceedings

On December 8, 2008, the SEC Division of Enforcement filed an Order Instituting Proceedings (OIP) against OOO-CentreInvest Securities (CI-Moscow), a Moscow-based broker-dealer specializing in the sale of second-tier Russian equities. The Division alleged violations of SEC registration, reporting, and record-keeping requirements from 2003 through 2007. The OIP also named as respondents CI-Moscow's United States

affiliate, CentreInvest, Inc. (CI-New York), along with several of the companies' United States and Russian employees, including Dan Rapoport. The allegations contained in the OIP form the entirety of the Commission's case against Rapoport. They are as follows:

The OIP alleges that Rapoport, a Russian resident, joined CI-Moscow in 1995, and in 1999, relocated to New York City to work as a managing director of CI-New York. Rapoport returned to CI-Moscow in 2003, where he oversaw both CI-Moscow and CI-New York's brokerage operations. At some point, he was promoted to executive director of CI-Moscow.

The OIP alleges that from 2003 until at least November 2007, "CI-New York was under the control of CI-Moscow." It further alleges that "CI-Moscow and Rapoport controlled" the New York entity by, *inter alia*, supervising and directing the staff of CI-New York and controlling its budget and finances. It further states that employees of CI-New York referred to Rapoport as the "boss" and to the Moscow entity as the "parent broker-dealer" of CI-New York.

The OIP alleges that CI-Moscow never registered as a foreign broker-dealer with the SEC. While Rapoport was working in New York, he was a registered representative, but after his return to Moscow, he was not registered or licensed to sell securities in the United States. Further, from "about 2003 until November 2007," CI-Moscow and Rapoport "solicited institutional investors in the United States to purchase and sell thinly-traded stocks of Russian companies . . . without registering as a broker-dealer as required by Section 15(a) of the Exchange Act" or meeting the requirements for exemption from registration for foreign broker-dealers under Exchange Act Rule 15a-6(a). The OIP alleges that Rapoport instructed CI-New York's employees to solicit U.S. institutional investors to

transact in the securities and to direct the investors to CI-Moscow to complete the transaction, and in some cases, Rapoport solicited the investors directly. It states that Rapoport knew that any CI-Moscow representative soliciting U.S. investors would have to be registered with the Commission or a U.S. self-regulatory organization.

The OIP concludes: "As a result of the conduct described above, CI-Moscow and Rapoport willfully violated Section 15(a) of the Exchange Act . . . ." The OIP alleges more generally that all of the respondents benefitted financially from these transactions.

Although the OIP leveled somewhat more specific allegations regarding the conduct of other CI-New York employees, the allegations described above represent the extent of the Enforcement Division's statements in the OIP about Rapoport. It did not cite a single specific instance in which Rapoport or the other respondents solicited a U.S. investor.

## B. Service Procedures

In December 2008, the Enforcement Division served the OIP on CI-New York and on attorneys for the other U.S. respondents. On December 15, 2008, the Division moved to serve the OIP on Rapoport and the other Russian respondents through their U.S. counsel because Russian authorities refuse to execute U.S. requests for service of process. The Division's motion relied on SEC Rule of Practice 141(a)(2)(iv), which provides that "[n]otice of a proceeding to a person in a foreign country may be made . . . by any . . . method reasonably calculated to give notice, provided that the method of service used is not prohibited by the law of the foreign country."

New York attorney Richard Kraut filed a memorandum in opposition to the Division's motion to serve Rapoport via Kraut. The memorandum included a footnote stating that Kraut "appear[s] solely for the purpose of opposing the Division's motion. By submitting this Memorandum, [Rapoport] do[es] not admit to the Commission's jurisdiction over [him]."

The Administrative Law Judge (ALJ) granted the Enforcement Division's motion to serve foreign representatives by serving their U.S. counsel. Thereafter, Rapoport moved for vacatur or reconsideration. On February 5, 2009, the ALJ denied the motion for vacatur or reconsideration and ordered that the service of the OIP on Rapoport and another Russian respondent be considered effective as of January 8, 2009, the last date on which the "Foreign Respondents received the OIP as confirmed by return receipt of certified mail." On February 12, 2009, Kraut filed notice of his withdrawal of his representation of Rapoport, effective February 5, 2009. Rapoport never suggested that he did not receive actual notice of the issuance of the OIP or the February 5, 2009 order. At oral argument, Rapoport's current counsel confirmed that Rapoport does not contend that he was unaware of the SEC proceedings.

### C. The Default Order

Rapoport did not respond to the OIP. On April 8, 2009, the Division moved for the ALJ to enter a default judgment against Rapoport. The motion was served on Kraut by Federal Express, although there is no indication it was served on Rapoport personally. Rapoport did not file an answer or opposition to the motion. The ALJ notified Rapoport of pre-hearing conferences by sending scheduling orders to his Moscow business address. Rapoport did not participate in those conferences.

On July 31, 2009, the ALJ entered the Default Order imposing sanctions on Rapoport and the other respondents. A copy of the Default Order was sent to Rapoport at his Moscow business address. When Rapoport entered the United States on October 23, 2009, a Customs officer personally served Rapoport with a copy of the Order.

In the Order, the ALJ explained that when a party is in default, allegations in an OIP are deemed to be true as to that party. 17 C.F.R. § 201.155(a). The ALJ recited the facts pertaining to Rapoport almost verbatim from the OIP and added no new facts. He noted particularly that the OIP "alleged that . . . Rapoport willfully violated Section 15(a) of the Exchange Act" by soliciting securities transactions with U.S. investors without being registered. The ALJ reasoned that because he could take the facts alleged in the OIP as true, and because the OIP alleged that Rapoport willfully violated Section 15(a), he could find that Rapoport "functioned as an unregistered broker and willfully violated Section 15(a)(1) of the Exchange Act."

Based solely on that rationale and the facts alleged in the OIP, the ALJ imposed sanctions on Rapoport. He ordered Rapoport to cease and desist from committing Section 15(a) violations, barred Rapoport from association with any broker or dealer, and ordered Rapoport to provide an accounting of income so he could be ordered to disgorge his ill-gotten gains with prejudgment interest.

The ALJ also imposed a civil monetary penalty on Rapoport under Exchange Act Section 21B(b), 15 U.S.C. § 78u-2(b). Section 21B(b) sets out three tiers of maximum penalties for "each [violative] act or omission." The maximum penalty applies to each act or omission and does not cap the total penalty. To qualify for second tier penalties, the act or omission must have "involved fraud, deceit, manipulation, or deliberate

or reckless disregard of a regulatory requirement." 15 U.S.C. § 78u-2(b)(2). The ALJ imposed second-tier penalties, which are capped at $65,000 for each act or omission committed by an individual after February 14, 2005, and $60,000 before that date. *See* 17 C.F.R. §§ 201.1002, .1003 (setting penalty amounts). The ALJ acknowledged that the OIP did not suggest how many individual violations Rapoport committed and stated that it was "necessary to determine how to appropriately parse up the violations committed by CI-New York, Rapoport, and [Rapoport's colleague] Yenin [and] whether to treat the entire course of conduct as a single act or as a series of acts."

Immediately thereafter, without actually doing any parsing or making any determinations, the ALJ opined that the defaulting Respondents had acted recklessly or with deliberate disregard of the regulatory requirements, and, thus, it was appropriate to impose the maximum second tier penalties on them. He calculated those penalties by imposing one maximum penalty for each year of the violative conduct—not by adding up alleged individual acts or omissions (and, indeed, he could not do so because the Enforcement Division never listed any in the OIP). The ALJ ordered Rapoport to pay a total penalty of $550,000. However, the ALJ realized upon Rapoport's later motion that he had miscalculated the sanctions and reduced Rapoport's penalty to $315,000.

### D. First Motion to Set Aside: ALJ Review

On December 23, 2009, Rapoport's new counsel entered his notice of appearance and moved to set aside the default judgment as to Rapoport pursuant to Exchange Act Rule 155(b), which allows an ALJ or the Commission to set aside a default "for good cause shown." 17 C.F.R. § 201.155(b). Under Rule 155(b), a defaulting party's motion must meet three requirements: it must be filed "within a reasonable time"; it

must state his reasons for failing to defend the underlying proceeding; and it must specify the nature of the defenses he proposes to mount against the underlying proceeding. *Id.*

On March 22, 2010, the ALJ denied Rapoport's motion on the grounds that Rapoport did not file his motion "within a reasonable amount of time," nor did Rapoport adequately explain why he had failed to defend the OIP. The ALJ reviewed each of Rapoport's proposed defenses to the OIP, including his denial of the allegations in the OIP. At this late point, the ALJ cited record evidence to show that Rapoport had in fact solicited U.S. investors without registering with the Commission. After reviewing and countering all of Rapoport's proposed defenses, the ALJ concluded that they had "no likelihood of success under the Commission case law," so setting aside the Default Order was not necessary to prevent injustice. As mentioned above, the ALJ did recalculate the second-tier sanctions but otherwise denied Rapoport's motion to set aside the Order.

### E.  Second Motion to Set Aside:  Commission Review

Next, Rapoport filed a motion with the SEC to set aside the Default Order, which it denied on January 2, 2011. The Commission provided a condensed version of the facts alleged in the OIP that were included in the Default Order, and recited the events culminating in the entry of the Default Order and the law judge's refusal to set aside the Order.

The Commission examined Rapoport's asserted reasons for failing to defend the proceeding and found that those reasons did not support setting aside the Default Order. The Commission also found that Rapoport did not file his Motion to Set Aside in a reasonable amount of time. The Commission looked to the date of service of the OIP—January 8, 2009—as the first date Rapoport could have been put on notice that default was a

possibility. The Commission recognized that Rapoport actually went into default on March 2, 2009, when he failed to file his answer to the Division's default motion. The Commission then looked to the date the ALJ entered the Default Order—July 31, 2009—to determine that Rapoport waited almost five months to file the motion. The Commission also mentioned the date that the customs officer served Rapoport personally with the Default Order.

The Commission recognized that the text of Rule 155(b) requires a party moving to set aside a default order to state his proposed defenses. It reasoned, however, that "[i]f Rapoport had established that his reasons for the failure to defend the proceeding supported setting aside the Default order, and that Motion to Set Aside I was filed within a reasonable time, then we would consider whether his proposed defenses had potential merit." But because Rapoport did not file his motion within a reasonable time and had offered no good reason for failing to defend the proceedings, the Commission decided that "[e]valuating the merits of his defenses would in effect grant him the hearing that he chose to forego by failing to defend the proceeding." Instead, the Commission opined, respondents should be motivated to participate in proceedings knowing that a default order can be entered on the basis of allegations in the OIP.

The Commission concluded that it was "not unjust" for the ALJ to issue the Default Order or to impose the sanctions. Rapoport now petitions this Court to review the Commission's application of Rule 155(b), as well as the Commission's imposition of sanctions on him.

## II.  Standard of Review

Under the Administrative Procedure Act, we must uphold the Commission's legal conclusions unless they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); *see Rockies Fund, Inc. v. SEC*, 428 F.3d 1088, 1092-93 (D.C. Cir. 2005).    We defer to the Commission's factual findings if they are supported by substantial evidence. 15 U.S.C. § 78(a)(4).

## III.  SEC Rule 155(b)

Securities and Exchange Commission Rule 155(b) states:

A motion to set aside a default shall be made within a reasonable time, state the reasons for the failure to appear or defend, and specify the nature of the proposed defense in the proceeding.  In order to prevent injustice and on such conditions as may be appropriate, the [ALJ], at any time prior to the filing of the initial decision, or the Commission, at any time, may for good cause shown set aside a default.

17 C.F.R. § 201.155(b).

Rapoport first posits that because Rule 155(b) includes wording similar to Federal Rule of Civil Procedure 55(c), which provides that "[t]he court may set aside an entry of default for good cause . . .," the SEC must interpret the term "good cause" in the same way that federal courts have interpreted the term. Specifically, he argues that before declining to set aside a default order, the Commission must consider three factors, including (1) the willfulness of the default; (2) whether setting aside the default order would prejudice the Commission; and (3) whether the defaulting party has offered a meritorious defense.

*See, e.g.*, *Keegel v. Key West & Caribbean Trading Co.*, 627 F.2d 372, 373 (D.C. Cir. 1980). Rapoport contends that, because the Commission did not consider those three factors, we must set aside the entry of the Default Order against him.

If an agency adopts a rule of practice similar to a long-established and much-used federal rule, it would assist persons subject to the agency's jurisdiction, as well as the administrative law judges and commissioners who must apply the rule, if that agency would explain how its rule is to be understood and highlight significant deviations from the federal standard. The Commission, however, is not bound to interpret its own rule in the same way federal courts interpret their rule, even if the two rules are worded similarly. The SEC is "free to fashion [its] own rules of procedure." *Vermont Yankee Nuclear Power Corp. v. Natural Resources Def. Council, Inc.*, 435 U.S. 519, 543 (1978). It may tailor those rules "to the peculiarities of the industry and the tasks of the agency involved." *FCC v. Schreiber*, 381 U.S. 279, 290 (1965). We defer to the Commission's interpretations of its own rules unless they are "plainly erroneous or inconsistent" with its regulations. *Auer v. Robbins*, 519 U.S. 452, 461 (1997); *Cement Kiln Recycling Coalition v. EPA*, 493 F.3d 207, 220 (D.C. Cir. 2007). *See also Dixon v. Love*, 431 U.S. 105, 115 (1977) ("[P]rocedural due process in the administrative setting does not always require application of the judicial model."); *McClelland v. Andrus*, 606 F.2d 1278, 1285 (D.C. Cir. 1979) ("[A]gencies need not observe all the rules and formalities applicable to courtroom proceedings.").

That said, agencies must apply their rules consistently. They may not depart from their precedent without explaining why. If they do, "we have no choice but to remand for a reasoned explanation." *Verizon Tel. Cos. v. FCC*, 570 F.3d 294, 304-05 (D.C. Cir. 2009). The Supreme Court has explained that

"[i]f the administrative action is to be tested by the basis upon which it purports to rest, that basis must be set forth with such clarity as to be understandable. It will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive." *SEC v. Chenery Corp.*, 332 U.S. 194, 196-97 (1947).

In this case, the SEC has both departed from its own precedent and left its Rule 155(b) interpretation "vague and indecisive" in at least two ways—first, with regard to which requirements the Commission must consider in rendering a decision under Rule 155(b), and second, with regard to the rule's timing requirement.

### 1. Rule 155(b) Requirements

Rule 155(b) establishes three requirements for motions to set aside defaults. They must (1) "be made within a reasonable time"; (2) "state the reasons for the failure to appear or defend" the original proceeding; and (3) "specify the nature of the proposed defense" to the original proceeding. 17 C.F.R. § 201.155(b). If the Commission determines that the petitioner has shown "good cause" for setting aside the default, then the Commission may do so at its discretion at any time. *Id.*

Here, the Commission determined that Rapoport filed his first motion to set aside the default after an unreasonable amount of time had passed—a determination we discuss below. It also concluded that Rapoport's reasons for failing to defend the OIP lacked merit. Then the Commission reasoned that because Rapoport failed to meet the timeliness requirement and had not offered a satisfactory explanation for why he failed to defend the OIP, the Commission would not consider Rapoport's proposed defenses to the OIP because "[e]valuating the merits of his

defenses would in effect grant him the hearing that he chose to forego by failing to defend the proceeding."

Rapoport contends that the Commission should be required to consider all three requirements of Rule 155(b). In its main brief, the Commission argues that in previous cases "the Commission has declined to consider proposed defenses when defaulting parties cannot justify their failure to answer or do not timely move to set aside the default." Respondent's Br. at 21. To support this argument, the Commission cites *In re Hellen*, 55 S.E.C. 248 (2001); *In re Ainbinder*, 1997 SEC LEXIS 2062 (Oct. 1, 1997); *In re Bullard*, 1995 SEC LEXIS 3049 (Nov. 9, 1995); and *In re Richards*, 1994 SEC LEXIS 2663 (Aug. 29, 1994). The problem is, not one of these cases actually supports that argument. In none of these cases did the Commission choose to ignore a petitioner's proposed defenses because the petitioner failed to meet the first two requirements of Rule 155(b).

In *Hellen* and *Richards*, the SEC found that the petitioners did not timely file their motions, and did not present valid reasons for failing to defend the OIPs, but neither Hellen nor Richards included any proposed defenses in their motions. 55 S.E.C. at 249-50; 1994 SEC LEXIS 2663, at *8. In those cases, the Commission could not decline to consider what the parties did not provide.

In *Ainbinder*, the SEC found that Ainbinder did not file his motion within a reasonable time and that his reason for failing to respond to the OIP was insufficient. 1997 SEC LEXIS 2062, at *2-3. The Commission did not state whether Ainbinder proposed any defenses. *See id*.

In *Bullard*, the Commission found that Bullard timely filed his motion but did not present sufficient reasons for failing to

respond to the proceedings. Nor did he specify any defenses. 1995 SEC LEXIS 3049, at *3-4.

In the hope of obtaining greater clarity on this issue, during oral argument, we asked counsel to supplement their main briefs with a discussion of the past application of Rule 155(b), specifically regarding whether the Commission previously has refused to consider a petitioner's proposed defenses included in his Rule 155(b) motion. The Commission submitted a supplemental brief containing every Commission decision it could find addressing a motion to set aside a default, which included the four decisions discussed above and three additional decisions.

The first additional decision, *In re Birman Managed Care*, 2008 SEC LEXIS 2810 (Sept. 23, 2008), appears to be an ALJ order, not a binding Commission decision; thus, we do not consider it here. In the second, *In re Rolandi Securities Corp.*, 1972 SEC LEXIS 738 (Apr. 12, 1972), the Commission granted a motion to set aside a default because the Division of Enforcement consented to the motion. It is therefore irrelevant to this case. In the final decision, the Commission granted the petitioner's motion to set aside a default. *In re Kern*, 2005 SEC LEXIS 744, at *3-5 (Feb. 1, 2005). It found that the motion was timely, and, without discussing any details of the proposed defenses, the Commission decided to "accept the proposed answer as an appropriate response" and set aside the default. *Id.*

Retreating from its position that the Commission previously had refused to consider proposed defenses in cases in which petitioners failed to meet the first two Rule 155(b) requirements, the Commission characterized the seven cases as standing for the broader proposition that when petitioners fail to meet any one of the three requirements, the Commission customarily has declined to consider whether the petitioner has met the other

two. Once again, the SEC mischaracterizes its precedent. As discussed above, in *Hellen*, *Richards*, and *Bullard*, the petitioner did not state any defenses; in *Ainbinder*, we do not know if the petitioner stated defenses; and in *Kern*, the Commission granted the motion and accepted the proposed defenses without explaining what those defenses were or what reasons for the petitioner's failure to respond to the OIP constituted a sufficient explanation.

We do not suggest that the Commission could not interpret Rule 155(b) in the manner it now proposes. Rather, we hold that the Commission has not provided a consistent interpretation of the Rule nor justified the apparent inconsistency of its application. Although the Commission is not bound to follow its precedent, it may not depart from its precedent without offering a reasoned explanation. *See Verizon Tel. Cos.*, 570 F.3d at 304-05. It has not provided such an explanation here.

### 2. Timing

The Commission also has failed to provide any intelligible standard to assess what constitutes a "reasonable" amount of time for filing a motion to set aside a default under Rule 155(b). In *Ainbinder*, the Commission started the clock on the date the default order was entered and tolled it four years later when the Commission received Ainbinder's motion. 1997 SEC LEXIS 2062, at *1-3. Because Ainbinder went to the Commission's New York office six months after the default was ordered to confirm the default, however, the Commission also suggested that it might look to the date of the confirmation to start the clock—but even so, Ainbinder did not act in a reasonable amount of time. 1997 SEC LEXIS 2062, at *3.

In *Richards*, the Commission found that the twenty-one years that elapsed between the entry of the default order and the

filing of the petitioner's motion to set aside the default did not constitute a reasonable amount of time. 1994 SEC LEXIS 2663, at *1, *4. In *Hellen*, the Commission also started the "reasonable time" clock on the date the default order was entered. It tolled the clock the day Hellen requested to set aside the default, almost a year later, which the Commission found to be an unreasonable amount of time. 55 S.E.C. at 248-49. In *Bullard* and *Kern*, the Commission started the clock on the day the default was entered, and found the petitioners' motions, filed five days and fourteen days later, respectively, to be timely. 1995 SEC LEXIS 3049, at *2-3; 2005 SEC LEXIS 744, at *4.

Here, the Commission looked to several dates to start the clock. The Commission explained that to determine whether Rapoport acted within a reasonable amount of time, "we look at more than just the date that he was personally served with the Default Order." This statement thus suggests that the Commission did, in some fashion, look to the date Rapoport was personally served, which was not a consideration in any previous SEC decision.

The Commission went on to suggest that the OIP itself put Rapoport on notice of the possibility of default. The Commission also noted that the Enforcement Division filed its Default Motion on April 9, 2009, and that the judge waited until July 31, 2009, more than three months later, to issue the Default Order, which was mailed to Rapoport that same day in Moscow. The Commission reasoned that not only did Rapoport wait five months to file his motion after the Default Order was entered, he had "been on notice of the possibility of default for more than eleven months . . . and had been in default for more than nine months (since he failed to file his answer by March 2)." The Commission added that under the circumstances just described, it found that Rapoport did not move to set aside the Default

Order within a reasonable time "when he filed Motion to Set Aside I two months after he was personally served with the Default Order."

We are not able to discern that the Commission has set forth a principled way in which to determine on what date the "reasonable time" clock starts running. The Commission generally looks to the entry of a default order, but it might also look to the date a petitioner shows up in its branch office to confirm a default, as in *Ainbinder*, or it might look to the date the OIP was served, the date the Enforcement Division filed its motion for default, or the date that a petitioner was personally served with the default order—all of which the Commission cited here—to inform its decision.

The Commission also has not stated with any clarity how it determined the reasonableness of the time by which a petitioner must file a motion to set aside a default. From *Hellen*, we know that a one-year time lapse between the entry of the default order and the petitioner's motion was an unreasonable amount of time on the facts of that case. In *Kern*, it found that fourteen days was reasonable. But the Commission decision before us cites the eleven months that elapsed since the filing of the OIP, the nine months Rapoport actually was in default, the five months from the entry of the Default Order, and the two months that elapsed after Rapoport was personally served as possible unreasonable amounts of time. Although agencies have flexibility in interpreting their own rules, their interpretations must not be "vague and indecisive." *See Chenery Corp.*, 332 U.S. at 197. As we have stated before, "We cannot defer to what we cannot perceive." *Int'l Longshoreman's Ass'n v. Nat'l Mediation Bd.*, 870 F.2d 733, 736 (D.C. Cir. 1989). The Commission has left "vague and indecisive" the date that starts the "reasonable time" clock, as well as the amount of time considered reasonable.

## IV. Sanctions

As an alternative argument, Rapoport has requested that we vacate the sanctions imposed on him by the Commission. In considering its further disposition of Rapoport's motion after our remand, we suggest that the Commission should give careful review to the law judge's analysis in the Default Order, which the Commission apparently relied upon in its earlier disposition. That analysis was inaccurate as well as inadequate to support the maximum second-tier civil penalties, even given our extraordinarily deferential review of SEC sanctions. *See Butz v. Glover Livestock Comm'n Co.*, 411 U.S. 182, 185-86 (1973) (SEC sanctions are not to be disturbed unless they are "unwarranted in law or . . . without justification in fact.").

The law judge's reasoning was inaccurate because he applied a faulty formula to calculate the penalties. Under 15 U.S.C. § 78u-2(a), the Commission may assess civil monetary penalties against any person the Commission finds has "willfully violated" various securities regulations. If the violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement," the Commission may impose "second tier" penalties. The Commission periodically adjusts the maximum penalty amounts. From 2001 to February 15, 2005, the maximum penalty per violative act or omission was $60,000. 17 C.F.R. § 201.1002. From February 15, 2005, to the conclusion of the relevant events alleged in the OIP in 2007, the maximum amount was increased to $65,000 for each violation. 17 C.F.R. § 201.1003.

In the Default Order, the ALJ explained that the Division's OIP "gives no indication as to the number of violations it believes CI-New York, Rapoport, and [Rapoport's colleague] Yenin committed in the course of the improper solicitation of U.S. investors, occurring over the course of five years."

Therefore, the ALJ reasoned, "it is necessary to determine how to appropriately parse up the violations committed by CI-New York, Rapoport, and Yenin; whether to treat the entire course of conduct as a single act or as a series of acts, as to which multiple penalties would be appropriate."

Having said that, the ALJ did not undertake any such parsing. Immediately after stating that parsing needed to be done, he wrote: "In this case, the actions of the defaulting Respondents demonstrate deliberate or reckless disregard of regulatory requirements. Accordingly, it is appropriate that each of the defaulting Respondents shall pay a second-tier penalty." He imposed the maximum penalty on each respondent five times—once for each year the alleged solicitations occurred.

In his order denying Rapoport's Motion to Set Aside the Default Order, the ALJ confirmed that the original Default Order provides "that the civil penalty was to be calculated to reflect the assessment of maximum second-tier penalties of $60,000 each year for conduct that occurred in 2003 and 2004 and $65,000 each year for 2005, 2006, and 2007," resulting in a sanction of $315,000.

These calculations do not follow the formula set by the statute. To impose second-tier penalties, the Commission must determine how many violations occurred and how many violations are attributable to each person, as the statute instructs.

Further, to impose second-tier penalties at all (much less the maximum penalty), the Commission must find that Rapoport "willfully" violated Exchange Act Section 15(a) and that he did so with "deliberate or reckless disregard" of the registration requirements. *See* 15 U.S.C. § 78u-2(a). The only statements in the OIP that support the second-tier penalties are several conclusory allegations that Rapoport "willfully violated Section

15(a) of the Exchange Act" and that he "knew" that CI-Moscow employees soliciting U.S. investors had to be registered. Although the ALJ could deem as true allegations in the OIP once Rapoport defaulted, *see* 17 C.F.R. § 201.155(a), these conclusory allegations that Rapoport willfully committed these violations are not enough to justify imposing maximum second-tier penalties without further explanation. As we have held before, the SEC must provide some meaningful explanation for imposing sanctions. Once again, as in *Rockies Fund*, the Commission's analysis, via the ALJ, "was not just superficial; it was nonexistent." *See* 428 F.3d at 1099.

## V. Conclusion

For the foregoing reasons, we grant Rapoport's petition for review, vacate the Commission's order, and remand to the Commission for further proceedings.